2011 WY 28

**In the Interest of CG, a minor child, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–10–0124.

Supreme Court of Wyoming.

Feb. 18, 2011.

Representing Appellant: Diane Lozano, State Public Defender; Tina (Kerin) Olson, Appellate Counsel; Wyoming Public Defender Program. Argument by Ms. Olson.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Jessica Y. Frint, Student Director, and Crofton P. Sacco, Student Intern, of the Prosecution Assistance Program. Argument by Ms. Frint.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1]   CG, a minor, appeals from the order of the juvenile court adjudging her guilty of two delinquent acts—interference with a peace officer and unlawful contact. She claims the evidence does not support the juvenile court's decision. We disagree and affirm.

### ISSUES

[¶ 2]   CG presents the following issues for our review:

I.   Was there insufficient evidence that the officer was in the lawful performance of his official duties when he physically dragged CG from her neighbor's car?

II.   Did the [juvenile] court err in finding that CG was not acting in self-defense when she struck the officer in the forearm?

### FACTS

[¶ 3]   In September 2009, the Juvenile Court of Natrona County adjudicated CG, a fourteen year-old minor, a child in need of supervision (CHINS) for failing to attend

school.[1] The juvenile court placed CG on probation and ordered her to regularly attend school, without any unexcused absences or instances of tardiness. On the morning of September 15, 2009, CG's mother (Mother) woke her around 5:45 a.m. so she could prepare for school and catch the school bus. For various reasons, CG did not get ready in time and she missed the bus.

[¶ 4] CG's stepfather was ill that morning and was unable to drive CG to school after she missed the bus. Her mother did not have a driver's license and did not have any money for a taxi to take CG to school. Mother reported the situation to CG's caseworker at the Department of Family Services. The caseworker advised Mother to call the non-emergency number at the Casper Police Department and ask for assistance in getting CG to school, which she did.

[¶ 5] Shortly thereafter, Casper Police Officer Marcus Maton responded to CG's residence. Mother informed Officer Maton of CG's increasingly disobedient behavior, her CHINS status, the need for CG to get to school, and of her refusal to do so. After entering the home, Officer Maton overheard CG, who was in her bedroom, screaming at her mother that she did not want to go to school. Officer Maton then spoke with CG about going to school. CG was rude to the officer, and he asked her to give him her iPod and cell phone because they were a distraction. She complied, and the officer immediately gave the iPod and cell phone to Mother, with a suggestion that she return them only when CG behaved better.

[¶ 6] Eventually, the officer persuaded CG to get into a neighbor's van to be taken to school. The neighbor drove, Mother rode in the front passenger seat, and CG was in the rear seat. Officer Maton followed in his patrol car. During the entire drive to school, CG was upset and angry; she was screaming and cussing at both Mother and the neighbor and demanding the return of her iPod and cell phone.

[¶ 7] When they arrived at the school, CG refused to get out of the neighbor's van. Both Mother and the neighbor told her several times to get out, but CG refused to do so. The neighbor then sought Officer Maton's assistance in getting CG out of the vehicle.[2] Officer Maton went to the van and asked CG several times to get out. CG refused. Ultimately, Officer Maton decided to remove CG from the vehicle. He reached into the van, grabbed CG by the right wrist, and directed her to get out. She responded, "No; get your hands off me; nobody touches me," and resisted by bracing herself against the driver's seat. As the officer pulled her out of the vehicle, CG punched him in the right forearm.[3] Officer Maton then placed CG under arrest for the assault.

[¶ 8] The next day, the State filed a delinquency petition in the juvenile court alleging that CG had committed two criminal offenses, to wit: that she had unlawfully touched Officer Maton in a rude, insolent or angry manner without intentionally using sufficient physical force to cause bodily injury in violation of Wyo. Stat. Ann. § 6–2–501(g)(i) (LexisNexis 2009); and that she had unlawfully and knowingly obstructed, impeded, or interfered with Officer Maton while he was engaged in the lawful performance of his official duties, in violation of Wyo. Stat. Ann. § 6–5–204(a) (LexisNexis 2009). Following a detention hearing conducted that same day, the juvenile court determined that it was neither appropriate nor in the best interest of CG to remain in her home, and it committed her to the physical and legal custody of the Department of Family Services for placement in the Youth Crisis Center. At her initial hearing, CG denied the allegations of the petition. The juvenile court set the matter for an adjudication hearing on November 5, 2009, and continued CG's current out-of-home placement at the Youth Crisis Center.

---

1. CG had missed 31 days of school during the year preceding the CHINS action.

2. By this time, Officer Maton, who was parked behind the van, knew that CG was not complying with the neighbor's and Mother's requests to exit the vehicle and had activated his car's video camera.

3. Officer Maton employed a "wristlock" to remove CG from the vehicle, which essentially is a compliance hold.

[¶ 9] At the adjudication hearing, the juvenile court heard testimony from Officer Maton, Mother, the neighbor, and CG, and viewed the video recording of the incident. At the conclusion of the hearing, the juvenile court found that the State had proven the allegations of the petition beyond a reasonable doubt and adjudicated CG a delinquent child. The juvenile court ruled in pertinent part:

[T]he officer was, I would find, in the lawful performance of his duties, because she was in a vehicle. Whether he was directly asked, implicitly, it was obvious his assistance was sought to remove her from the vehicle after she'd been requested to and refused. And, therefore, the evidence shows that he was in the lawful performance of his official duties. She refused his instruction to get out of the vehicle. And I would find that the State has proven beyond a reasonable doubt those elements necessary for interference with a police officer.

The battery, unlawful touching, the elements as established back in *Amin*, A–M–I–N, *versus State*, 694 P.2d 119 [ (Wyo. 1985) ], elements of battery are an unlawful—are an unlawful touching of another in a rude, insolent or angry manner. It goes on to provide, [o]r intentionally, knowingly, or recklessly causing bodily harm. Well, we're not dealing with the "or" part. We're dealing with the first part.

The argument as to her self-defense, the *Iseli*, I–S–E–L–I, [*Iseli v. State*, 2007 WY 102, 160 P.3d 1133 (Wyo.2007) ] case talks about when people can and cannot use self-defense involving a police officer. And there's a little different discrepancy between this case and that case. But here's the difficulty I see with your argument: [Defense counsel], your argument is correct that she's entitled to use self-defense. Then what it would place is a situation where the officer—and I've already found that he was in the lawful performance of his duties.

Then someone can resist arrest and—and basically do what's necessary to evade and avoid a situation where they're being placed in or being asked to do what they're legally required to do by directive of the police officer. That would be utter chaos. That is where people would get hurt. That is where people—I mean, that elevates the situation.

And I don't believe that unless there's—it's—you're reasonably in fear of your life and there's excessive force being used by the police officer, he pulls a gun out, and—and, you know, you are trying to defend yourself or something, I don't see that as reasonable under the facts and circumstances, particularly when he's in the lawful performance of his duties.

She then refuses to leave, and in the process of that, he is struck. And I don't believe that that striking was in self-defense nor would it be reasonably appropriate under the circumstances.

Moreover, it—I don't think that it requires—she certainly knew he was a police officer, and that goes back to the interference with a police officer. But she was attempting to resist, and she struck him in the process, and that touching was in a rude, insolent, or angry manner.

And the [video] is evident. . . . I've seen officers escalate things much quicker and much more vigorously and physically than this officer did in this case. He didn't get the stun gun out and shoot her. He—he grabbed her by the wrist. And I—I would have—I don't have any training, but that would have been my first reaction is to try to pull her from that and try to get her out of there.

And I don't see that that—his response was excessive or inappropriate. I don't see that. I certainly see that the evidence proves beyond a reasonable doubt that she unlawfully touched the officer in a rude, insolent, or angry manner.

Thereafter, the juvenile court placed CG on nine months of supervised probation under specified terms and conditions. This appeal followed.

## DISCUSSION

### Standard of Review

[¶ 10] The issues as presented question whether the evidence sufficiently supports

the juvenile court's adjudication of guilt as to both offenses. To that end, we are guided by what we said in *Trumbull v. State*, 2009 WY 103, 214 P.3d 978 (Wyo.2009):

> In discussing the facts of this case, we apply the principle that the evidence should be examined in the light most favorable to the State when a question of the sufficiency of the evidence is raised. We accept as true evidence favorable to the State; we disregard evidence favorable to the defendant in conflict with the State's evidence; and we afford to the State's evidence every favorable inference which may reasonably and fairly be drawn from it. *Harvey v. State*, Wyo., 596 P.2d 1386 (1979); *Hovee v. State*, Wyo., 596 P.2d 1127 (1979). Heretofore we have had occasion to apply these concepts only to cases tried before juries. We have no compunction, however, in joining other courts which have applied these concepts in trials to the court. *Simmons v. State*, 255 Ark. 82, 498 S.W.2d 870 (1973); *People v. Johnson*, 276 Cal.App.2d 232, 80 Cal.Rptr. 683 (1969). The function of the finder of fact in cases tried to a court is identical to that in cases tried to juries, and the same rules are applicable with respect to the standards and principles applied in appellate review.

*Trumbull*, ¶ 9, 214 P.3d at 980 (quoting *Fitzgerald v. State*, 599 P.2d 572, 574 (Wyo. 1979)). To the extent the issues concern a pure question of law, our review is de novo. *Dougherty v. State*, 2010 WY 116, ¶ 4, 237 P.3d 403, 404 (Wyo.2010).

### Analysis

[¶ 11] CG first takes issue with the juvenile court's finding that Officer Maton was engaged in the lawful performance of his official duties, a necessary requirement for a finding of guilt on the interference charge under § 6–5–204(a). CG contends that, because she was not committing a crime, Officer Maton had no authority to either direct her to leave the neighbor's van or to forcibly remove her from the vehicle when she refused his request. CG further argues that Officer Maton seized her within the meaning of the Fourth Amendment to the United States Constitution and Article 1, § 4 of the Wyoming Constitution, and that the seizure

was unreasonable because it was not grounded on a perception that she had committed or was committing a crime. Accordingly, CG contends that when Officer Maton seized her, he acted unlawfully and therefore was not engaged in the lawful performance of his official duties.

[¶ 12] CG's argument is predicated on a narrow view of the scope of a peace officer's official duties. However, a peace officer's duties are not limited to arrests for crimes, as CG contends, but encompass a broad range of activities. In addition to performing traditional law enforcement activities, such as investigating crimes, arresting perpetrators, and issuing traffic citations, peace officers routinely engage in a variety of community caretaker functions that are unrelated to the detection and investigation of criminal activity, including performing welfare checks, helping stranded motorists, preserving property, and assisting and protecting citizens in need. *See* Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment*, 1998 U. Chi. Legal. F. 261; Mary Elisabeth Naumann, Note, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J.Crim. L. 325 (1998–1999); *see also Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 714–15 (1973); *State v. D'Amour*, 150 N.H. 122, 834 A.2d 214 (2003); *State v. Lovegren*, 310 Mont. 358, 51 P.3d 471, 473–75 (2002); *State v. Gocken*, 71 Wash.App. 267, 857 P.2d 1074 (1993); *Crauthers v. State*, 727 P.2d 9 (Alaska App. 1986). Community caretaking is based on the notion that police serve to ensure the safety and welfare of the citizenry at large. *Cady*, 413 U.S. at 447–48, 93 S.Ct. at 2531, 37 L.Ed.2d at 718; *State v. Diloreto*, 180 N.J. 264, 850 A.2d 1226, 1233 (2004). Over the years, this Court has recognized the community caretaker function of law enforcement in a variety of contexts. *See Shaw v. State*, 2009 WY 18, ¶¶ 23–24, 201 P.3d 1108, 1113 (Wyo.2009) (trooper performing a community caretaker duty when she stopped to assist driver whose vehicle was stuck in a snow drift); *Bloomquist v. State*, 914 P.2d 812, 821–22 (Wyo.1996) (officers engaged in a community caretaker activity when they con-

tinued to question a vehicular-homicide arrestee about the number of passengers in the vehicle at the time of the accident); *Morris v. State*, 908 P.2d 931, 935 (Wyo.1995) (officers acting in their community caretaker role when they escorted an unsteady and disoriented man to the sheriff's office so he could call a friend for a ride); *Wilson v. State*, 874 P.2d 215, 221–22 (Wyo.1994) (officer performing a community caretaker duty when he stopped a limping man in the vicinity of a fire).

[¶ 13] In the instant case, the record discloses that CG had refused to exit the neighbor's vehicle despite numerous requests by Mother and the neighbor. The neighbor clearly wanted CG out of her vehicle and requested Officer Maton's assistance in getting her out. Officer Maton acted upon the neighbor's request out of concern for her safety, as well as the safety of Mother and CG. He testified that CG's behavior was escalating and he was concerned the situation might get physical if he did not intervene. Given these facts, we conclude that Officer Maton was engaged in the performance of his community caretaker duties when he directed CG out of the neighbor's vehicle and when he physically removed her. Therefore, the juvenile court correctly found that Officer Maton was acting in the lawful performance of his official duties at the time CG resisted his efforts.

[¶ 14] In her second issue, CG complains that the juvenile court erroneously rejected her self-defense claim. She maintains that Officer Maton used excessive force in removing her from the neighbor's vehicle. This, she contends, gave rise to the right to use reasonable force to defend herself from attack and, thus, permitted her to respond by striking the officer.

[¶ 15] Our response to CG's complaint will be brief. The law in Wyoming is clear that self-defense is not available to a person where the peace officer has not used excessive force. *Yetter v. State*, 987 P.2d 666, 669 (Wyo.1999); *Best v. State*, 736 P.2d 739, 745 (Wyo.1987); *Roberts v. State*, 711 P.2d 1131, 1134–35 (Wyo.1985); *see also Iseli v. State*, 2007 WY 102, ¶¶ 18–20, 160 P.3d 1133, 1138–39 (Wyo.2007). Thus, a finding that CG acted in self-defense when she struck Officer Maton was contingent on a finding the officer used excessive force in effectuating her removal from the vehicle. The evidence presented to the juvenile court showed that the degree of force employed by Officer Maton consisted of applying a compliance grip to CG's right wrist, which she testified hurt "a little," and physically pulling her from the vehicle. The juvenile court found, and we believe correctly so, that the force used by the officer was not excessive under the circumstances. Absent a finding of excessive force, the juvenile court had no legal basis upon which it could sustain CG's claim of self-defense.[4]

### CONCLUSION

[¶ 16] We hold that sufficient evidence exists to sustain the juvenile court's finding of guilt as to both offenses. We therefore affirm the order of the juvenile court adjudicating CG a delinquent child.

---

4. Because self-defense was not available to CG absent a finding Officer Maton used excessive force, the State was not required to disprove her claim of self-defense, as she maintains. *Iseli*, ¶ 20, 160 P.3d at 1139.