# IN THE SUPREME COURT, STATE OF WYOMING

## 2017 WY 5

OCTOBER TERM, A.D. 2016

January 23, 2017

CODY J. TINGEY,

Appellant
(Defendant),

v.

S-16-0085

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Uinta County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*
David McCarthy, Laramie, WY.

*Representing Appellee:*
Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Theodore R. Racines, Senior Assistant Attorney General; and Katherine A. Adams, Assistant Attorney General. Argument by Mr. Racines.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]   Cody Tingey was convicted of two counts of felony interference with a peace officer, one count of misdemeanor interference with a peace officer, and one count of misdemeanor simple assault.  Mr. Tingey appeals his conviction on the interference counts, claiming the district court erred in failing to give the jury theory of defense instructions and that his Sixth Amendment right to effective assistance of counsel was violated.  We affirm.

## ISSUES

[¶2]   Mr. Tingey states the issues on appeal as follows:

> I.      Did the court commit reversible error by refusing to give Mr. Tingey's proposed theory of defense instructions sufficient to apprise the jury of his theory of the case when there was competent evidence presented to support that theory?
> II.     Did trial counsel's failure to file a motion to suppress, renew the motion for judgment of acquittal at the end of trial, and propose appropriate theory of defense instructions violate Mr. Tingey's Sixth Amendment right to effective assistance of counsel?

## FACTS

[¶3]   On the evening of May 23, 2015, Cody Tingey and his girlfriend, Breanna May, had a gathering at their home in Evanston.  The guests were Ms. May's sister, Tara Wisenbaker, and her husband, and another couple and their children.  The adults drank alcohol and some, if not all of them, smoked marijuana.  The party ended and the guests left by about 11:30 or midnight.

[¶4]   After their guests left, Mr. Tingey and Ms. May got into an argument.  Mr. Tingey called Ms. May's father "to figure out what to do" and because he did not want to become violent with Ms. May.  After the phone conversation with Mr. Tingey, Ms. May's father, at about 1:00 the morning of May 24th, called Ms. Wisenbaker and asked her to pick up Ms. May and bring her to his home.

[¶5]   Ms. Wisenbaker had been drinking earlier in the evening so she had her daughter drive her to the home of Mr. Tingey and Ms. May.  When she arrived at the home and knocked on the door, Mr. Tingey let her in and led her to the guest bedroom where she found Ms. May, who appeared to be passed out.  Ms. Wisenbaker woke Ms. May and told her she was there to take her to her father's home.

1

[¶6]    The accounts of what happened next are conflicting.  According to Ms. May, she told Ms. Wisenbaker everything was fine and she and Mr. Tingey repeatedly asked Ms. Wisenbaker to leave.  According to Ms. Wisenbaker, Ms. May said she wanted Mr. Tingey to leave the house, which angered Mr. Tingey.  Regardless of which account is accurate, it is undisputed that Mr. Tingey then forcibly removed Ms. Wisenbaker from the home.  Mr. Tingey grabbed Ms. Wisenbaker from behind, forced her through the house to the back door, with his knees against the back of her legs, and pushed her through the back door where she landed against her vehicle.  Ms. Wisenbaker suffered scrapes and bruises from being knocked into objects as Mr. Tingey forced her through the house.

[¶7]    When Ms. Wisenbaker was forced out the back door and against her vehicle, her daughter called 911 on her cell phone.  Ms. Wisenbaker took the phone from her daughter, got in the vehicle, and instructed her daughter to pull out of the driveway and park in front of the home.  Ms. Wisenbaker then reported the incident to the 911 operator, and she and her daughter waited for law enforcement to arrive.

[¶8]    Officer Paul Robbins and Sergeant Preston Sheets arrived at the home at the same time, followed within seconds by Officer Kenny West and Officer Janeen Gilbert, who were riding together.  Sergeant Sheets went to the front door with Officer Gilbert behind him.  When Sergeant Sheets knocked on the front door and received no response, Officers Robbins and West walked up the driveway to the back door.  At the back door, Officers Robbins and West smelled the odor of burnt marijuana.

[¶9]    While Officers Robbins and West were at the back door, Mr. Tingey opened the front door, and the officers then returned to the front of the house to join Officer Gilbert and Sergeant Sheets.  Sergeant Sheets explained what happened and what he observed when Mr. Tingey opened the front door:

> Q.    Okay.  And what was Cody's – what was Cody Tingey's demeanor when he responded to the door?
> A.    When he answered the door, he was immediately abrading us with – calling us different names, F-ing pigs, bitches, yelling at us in an aggressive manner.  He also was in an aggressive stance as well.
> Q.    And can you describe what stance he was in then at the door?
> A.    His – his arms were raised and kind of in fists as he would talk, clenched.
> Q.    Were you able to identify to him why you were there?

2

A.     We attempted to.  It was difficult to get a word in edgewise.  I attempted to let [him] know we were there because of [Ms. Wisenbaker's] call but I don't know if he heard what I was saying but I attempted to tell him.

Q.     Okay.  Were you able to get any information from Mr. Tingey about the altercation with Ms. Wisenbaker?

A.     I was not.

Q.     Did he ever acknowledge having any interactions with Ms. Wisenbaker?

A.     I don't believe so.

Q.     What happened – can you describe what happened while you were talking to him?  Was there any other activity other than this discussion that was occurring?

A      We were trying – I was also trying to talk to Breanna.  They'd only opened the door just – probably a short distance, one to two feet open is all.

Q.     Was Breanna there when Cody first opened the door?

A.     I think she was in the living room.

Q.     And so at some point were – when were you able to speak with her?

A.     I don't remember the exact – the door, they'd opened and shut it on us numerous times while I was standing there and I don't remember which time it was, but she did eventually open the door herself to speak to me.

Q.     Were you able to communicate with her then?

* * *

A.     Not very well.  Cody was still yelling in the background, so it was difficult to have a conversation with her.

Q.     And what was the nature of your conversation with her?

A.     We were trying to see if she was okay, trying to find out what the claim was that her and Cody had been fighting.  We were trying – I was attempting to ask her about that.

Q.     So you had said at some point you had asked her to step outside?

A.     I did.

Q.     Why was that?

A.     I was trying to separate her from Cody so that we could have a conversation without him yelling in the

3

background, to try to defuse the situation that we had going right there because it was definitely a volatile one.

    Q.     And why did you assess it as volatile?

    A.     She didn't – she acted like she didn't want to talk to us, but then with him yelling in the background and still yelling obscenities, it made it volatile and the situation was pretty tense.

    Q.     So it was tense right from the start?

    A.     Yes.

    Q.     In addition to trying to communicate with the two occupants that you saw in the home, did you make any observations related to your presence there?

    A.     After they had opened the front door, I could smell the odor of burnt marijuana emanating from the residence.

[¶10]  During the course of the attempts to communicate with Mr. Tingey and Ms. May, Sergeant Sheets remained on the front porch, with Officer Gilbert just behind him on the sidewalk a step down.  Once Officers Robbins and West returned from the back door, Officer West remained near the front door on the steps and Officer Robbins was intermittently between the front porch and the vehicle where Ms. Wisenbaker was located.[1]  Each of the officers was able to recognize the odor of marijuana, by training, experience, or both, and each was able to smell the odor of marijuana emanating from the front door.  At one point, Sergeant Sheets stated he could smell marijuana and Mr. Tingey responded to the effect, "Of course, you smell it.  I smoke it."

[¶11]  Officer Robbins and Sergeant Sheets discussed the marijuana odor, and Officer Robbins stated he was going to get a search warrant for the home.  Sergeant Sheets then, in a raised voice, instructed Ms. May and Mr. Tingey that they needed to leave the residence.  Neither Ms. May nor Mr. Tingey complied.

[¶12] Either immediately before instructing Ms. May and Mr. Tingey to leave the residence, or immediately after, Sergeant Sheets pushed the door open so he could better see Mr. Tingey's location, which was about ten feet from the front door.  When the instruction to leave the home was not complied with, the officers entered the home with the intention of escorting Ms. May and Mr. Tingey from the home.  Sergeant Sheets entered first, with Officer Robbins immediately behind him.  When they entered the home, Mr. Tingey came toward them in what Officer Sheets described as an aggressive manner, yelling with his fists raised.

---

[1] Officer Robbins was the only officer to wear an audio recorder on his person, and that recording was entered into evidence.  It was not a complete account of the events that transpired on the front porch because Officer Robbins was not on the front porch for the entire incident.

4

[¶13] Sergeant Sheets went directly toward Mr. Tingey and attempted to secure Mr. Tingey's left arm. As soon as Sergeant Sheets placed a hand on Mr. Tingey, however, he was shoved backward into a shelf and then into a chair. Sergeant Sheets did not know who or what shoved him backwards, but by the time he righted himself, Mr. Tingey was on the floor and Officers West and Gilbert had entered the home and were assisting in the attempt to secure Mr. Tingey.

[¶14] At the time Sergeant Sheets was shoved away, Officer Robbins had a hand on Mr. Tingey's right wrist. Mr. Tingey was struggling and fighting, and when Officer Robbins attempted to pull Mr. Tingey's arm around his back, they both ended up on the floor with Mr. Tingey on his back and Officer Robbins on top of him. Mr. Tingey then punched Officer Robbins three times in the face, causing pain, bruising and swelling.

[¶15] When Officer West attempted to help, Mr. Tingey grabbed and bent his glasses. Officer West also suffered a loosened front tooth, but he did not know how that had occurred. When the officers were able to get Mr. Tingey onto his stomach, he was still kicking, and Officer Gilbert attempted to secure his legs by sitting on them. In the course of that attempt, Officer Gilbert was kicked in her calf and suffered bruising.

[¶16] Once Mr. Tingey was handcuffed and had been searched, the officers attempted to move Mr. Tingey into a seated position on the ground. As they were moving him, Mr. Tingey swung his legs around and kicked Sergeant Sheets in the groin, causing him moderate testicular pain that dissipated to a dull pain after about three hours. When the officers again secured Mr. Tingey, they raised him to his feet and escorted him from the home and to Officer Robbins' patrol vehicle.

[¶17] Mr. Tingey continued to swear at the officers, and when the officers attempted to place him in the patrol vehicle, he spit in Officer West's face and tried to head butt him. Mr. Tingey then refused to be placed in the vehicle. Eventually, at Mr. Tingey's request, Sheriff's Deputy Kirby Lamb was called to the scene and was able to calm Mr. Tingey enough to get him in the patrol vehicle.

[¶18] After Mr. Tingey was escorted from the scene, Ms. May was asked to leave the residence and she willingly complied. Officers then entered the home to ensure there were no other occupants and having found no one else, they waited outside until a search warrant was obtained. Once a search warrant was obtained, Ms. May was allowed to remain in the living room while the home was searched. During the search, officers recovered marijuana, marijuana-related paraphernalia, edibles with THC content, and miscellaneous bags of pills and tablets.

[¶19] On June 15, 2015, the State filed an information charging Mr. Tingey with three counts of felony interference with a peace officer based on allegations that he

intentionally and knowingly caused bodily injury to Sergeant Sheets and Officers Robbins and West. The State later amended the information to add a charge of misdemeanor simple assault, alleging Mr. Tingey attempted to cause bodily injury to Ms. Wisenbaker.

[¶20] A three-day jury trial was held on January 4-6, 2016, and the jury returned a verdict finding Mr. Tingey guilty of two counts of felony interference with a peace officer on the charges relating to Sergeant Sheets and Officer Robbins, one count of misdemeanor interference with a peace officer on the charge related to Officer West, and one count of misdemeanor simple assault on the charge related to Ms. Wisenbaker. On February 11, 2016, the district court entered a judgment sentencing Mr. Tingey to serve eighteen months to seven years on each of the felony interference counts and 180 days on the misdemeanor interference count, to be served concurrently. Mr. Tingey was ordered to pay a fine of $750.00 on the misdemeanor simple assault count. On February 26, 2015, Mr. Tingey filed his notice of appeal to this Court.

## DISCUSSION

### I.     Failure to Give Theory of Defense Instructions

[¶21] The jury was given elements instructions on both felony interference with a peace officer and the lesser included offense of misdemeanor interference with a peace officer. Misdemeanor and felony interference with a peace officer are statutorily defined as follows:

> (a) A person commits a misdemeanor punishable by imprisonment for not more than one (1) year, a fine of not more than one thousand dollars ($1,000.00), or both, if he knowingly obstructs, impedes or interferes with or resists arrest by a peace officer *while engaged in the lawful performance of his official duties*.

> (b) A person who intentionally and knowingly causes or attempts to cause bodily injury to a peace officer *engaged in the lawful performance of his official duties* is guilty of a felony punishable by imprisonment for not more than ten (10) years.

Wyo. Stat. Ann. § 6-5-204 (LexisNexis 2015) (emphasis added).

[¶22] Mr. Tingey's theory of defense was that the officers who entered his home were not engaged in the lawful performance of their duties. More particularly, Mr. Tingey asserted: 1) the officers had no legal basis to enter his home and were therefore not

6

engaged in the lawful performance of their duties when Mr. Tingey became physically violent, which is a defense to the charge of interference; and 2) because the officers were not lawfully in the home, he had a right to use self defense against them.

[¶23] In furtherance of his defense, Mr. Tingey offered five jury instructions, four on self defense and one on search and seizure. The four self defense instructions, which were proposed instructions A, B, D, and E, read:

## INSTRUCTION NO. A

It is lawful for a person who is being assaulted to defend himself from attack if he has reasonable grounds for believing and does believe that bodily injury is about to be inflicted upon him. In doing so he may use all force which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent.

## INSTRUCTION NO. B

A person who has reasonable grounds to believe, and actually does believe that he is threatened with an attack that justifies the exercise of the right of self-defense, need not retreat or consider whether he can safely retreat, so long as he does not use deadly force. He is entitled to stand his ground and use such force as is reasonably necessary under the circumstances to secure himself from the attack. This law applies even though the assailed person might have been able to gain safety by flight or by withdrawal from the scene.

## INSTRUCTION NO. D

A person may defend his home or habitation against anyone who manifestly intends or endeavors in a violent or riotous manner, to enter that home or habitation and who appears to intend violence to any person in that home or habitation. The amount of force which the person may use in resisting such trespass is limited by what would appear to a reasonable person, in the same or similar circumstances, necessary to resist the violent or unlawful entry. A person is not bound to retreat even though a retreat might safely be made. A person may resist force with force, increasing it in proportion to the intruder's persistence and violence if the circumstances

7

apparent to him are such as would excite similar fears and a similar belief in a reasonable person.

**INSTRUCTION NO. E**

A person who unlawfully and by force enters or attempts to enter another's home or habitation is presumed to be doing so with the intent to commit an unlawful act involving force or violence.

[¶24] Mr. Tingey's proposed instruction on search and seizure law, which was proposed instruction C, quoted Article 1, Section 4 of the Wyoming Constitution. It read:

**INSTRUCTION NO. C**

You are instructed that the Wyoming Constitution provides "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized."

[¶25] The district court refused the five instructions. The court refused the self defense instructions on the ground that self defense is available against a police officer only upon a showing that the officer used excessive force. The court refused Instruction No. C, the quote from the Wyoming Constitution, on the ground that the instruction would not be helpful to the jury and would cause confusion.

[¶26] Mr. Tingey contends that the district court erred in denying his proposed jury instructions A, B, D, and E, and his proposed jury instruction C. He further contends that the court committed plain error in failing to on its own provide the jury with proper theory of defense instructions.

A.    **Standard of Review**

[¶27] The failure to give an offered instruction on the law related to a theory of defense is a due process issue, which this Court reviews *de novo*. *James v. State*, 2015 WY 83, ¶ 17, 357 P.3d 101, 105 (Wyo. 2015) (citing *Nelson v. State*, 2010 WY 159, ¶ 13, 245 P.3d 282, 285 (Wyo. 2010)). The failure to give an instruction that is not offered by a defendant is reviewed for plain error. *Vaught v. State*, 2016 WY 7, ¶ 13, 366 P.3d 512, 515 (Wyo. 2016); *Schaeffer v. State*, 2012 WY 9, ¶ 26, 268 P.3d 1045, 1056 (Wyo. 2012). To prevail on his claim of plain error, Mr. Tingey

8

must establish by reference to the record that a clear and obvious violation of a clear and unequivocal rule of law adversely affected a substantial right to such a degree that he was materially prejudiced. To show material prejudice, [Mr. Tingey] must demonstrate a reasonable possibility that the jury verdict would have been more favorable in the absence of the error. *Kovach v. State*, 2013 WY 46, ¶ 79, 299 P.3d 97, 122 (Wyo.2013). To establish that failure to give the instruction violated a clear rule of law, he must provide authority showing that, at the time of his trial, Wyoming law had a clear-cut requirement that juries be given the instruction he now champions. *Causey v. State*, 2009 WY 111, ¶¶ 20–21, 215 P.3d 287, 293–94 (Wyo.2009).

*Vaught*, ¶ 14, 366 P.3d at 516 (footnote omitted).

## B.    Analysis

[¶28]  We will first address Mr. Tingey's claim that the district court erred in refusing his proffered theory of defense instructions.  We will then address his plain error claim.

## 1.    Refusal of Proffered Instructions

[¶29]  As reflected in our standard of review, a defendant has a due process right to a jury instruction that details the defendant's theory of the case.  *James*, ¶ 18, 357 P.3d at 105 (quoting *Nelson v. State*, 2010 WY 159, ¶ 14, 245 P.3d 282 at 285-86 (Wyo. 2010)).  We have also said, however, that:

> "[n]ot every instruction must be given simply because there is a claim that it incorporates a theory of the case." *Wilkening v. State*, 922 P.2d 1381, 1383 (Wyo.1996). A trial court may properly refuse to give a proposed instruction if it is erroneous, confusing, argumentative, or if the instruction unduly emphasizes one aspect of the case, the law, or the defendant's version of the events. *Madrid v. State*, 910 P.2d 1340, 1346 (Wyo.1996); *Jansen v. State*, 892 P.2d 1131, 1140 (Wyo.1995); *Virgilio v. State*, 834 P.2d 1125, 1128 (Wyo.1992).

*Iseli v. State*, 2007 WY 102, ¶ 10, 160 P.3d 1133, 1136 (Wyo. 2007) (quoting *Farmer v. State*, 2005 WY 162, ¶ 23, 124 P.3d 699, 707 (Wyo. 2005)).

[¶30] This is precisely the problem with the theory of defense instructions offered by Mr. Tingey. They were either erroneous statements of law or would do no more than create confusion.

**a.      Self Defense Instructions Offered by Defense**

[¶31] We begin with Mr. Tingey's four proposed self defense instructions. The law in Wyoming is clear that self defense is not available against a peace officer unless the officer uses excessive force. *CG v. State*, 2011 WY 28, ¶ 15, 248 P.3d 186, 190 (Wyo. 2011); *Iseli*, ¶ 18, 160 P.3d 1138. Mr. Tingey's four proffered self defense instructions did not reflect this limitation and were not correct statements of the law as it pertains to the availability of self defense against a peace officer. The district court therefore did not err in refusing the instructions.

[¶32] Mr. Tingey next argues that the self defense instructions should have been given because he offered the district court a variation on the instructions that would have corrected them. We do not agree that the variation suggested during the instructions conference would have corrected the self defense instructions. Defense counsel argued as follows for the variation:

> [Defense Counsel]: * * * But I think the instructions can be cleaned up to the extent of if you find that the officers engaged in the lawful performance of their duty, then the defendant has no right to self-defense. But in the event you find against, the officers are not engaged in a lawful performance of their duties, then this is the law and it should be given.
> THE COURT: Are you talking about that as an additional argument in support of your instructions A and B or just D and E or both of them?
> [Defense Counsel]: I think on all four of them, your Honor.
> THE COURT: Okay. So, in essence, you're asking for a revision on the instruction that if – in essence, first, go through and see if you think the officers were lawfully performing their duty; is that right?
> [Defense Counsel]: Right. And if they believe it is, that's the end of it. Self-defense, resisting intruder, assailed defense –
> THE COURT: Doesn't apply?
> [Defense Counsel]: -- danger of intruder would not apply. But in the event there's a finding by the jury of one of the elements of the crimes of the three counts, that, in fact,

10

they were not in the lawful performance of their duty, I think the law at that point is they do have that right and I think [*Mickelson*], at least impliedly, implies that.

\* \* \*

THE COURT: Okay. Well, the Court's considered the arguments of both Counsel and the Court's going to stand by my decision to not give A, B, D, and E.

[¶33] The variation offered by Mr. Tingey was essentially an instruction that a defendant is allowed to use self defense, meaning force, against a peace officer if that officer unlawfully enters the defendant's home. That is not the law. We have said:

> When an individual is confronted by a uniformed police officer attempting to effect an arrest [or secure a premises], any act of self-defense also amounts to resisting arrest [or interference]. In such a situation, a claim of self-defense is circumscribed by what we said in *Roberts v. State*, Wyo., 711 P.2d 1131, 1135 (1985):
>
> > "There may be situations in which police activity is so provocative and resistance so understandable that it can only be concluded that the police were not engaged in the lawful performance of their official duties."
>
> If that situation is present, the law permits a person to use such force as he reasonably believes necessary to protect himself against **excessive force** by the officer which might be considered a separate assault. *State v. Holley*, Fla., 480 So.2d 94 (1985); *State v. Thomas*, Mo., 625 S.W.2d 115 (1981); *State v. Castle*, 48 Or.App. 15, 616 P.2d 510 (1980); *State v. Eckman*, 9 Wash.App. 905, 515 P.2d 837 (1973); Annot., 77 A.L.R.3d, § 2 at 284–286.

*Best v. State*, 736 P.2d 739, 745 (Wyo. 1987) (emphasis added).

[¶34] When a peace officer uses excessive force, he is not considered to be engaged in the lawful performance of his official duties, and the law permits a person to use the force he or she reasonably believes is necessary to protect against that use of excessive force. *Yetter v. State*, 987 P.2d 666, 669 (Wyo. 1999). This does not mean that any instance of unlawful conduct by a peace officer will justify force against that officer. For example, a peace officer's entry of a premises in contravention of the occupant's constitutional rights but without excessive force will not entitle the occupant to use force against the peace

11

officer or act in self defense. Mr. Tingey's reliance on *Mickelson v. State*, 906 P.2d 1020 (Wyo. 1995) to argue otherwise is misplaced.

[¶35] In *Mickelson*, police officers entered a private business without a warrant and without consent or the presence of exigent circumstances. *Mickelson*, 906 P.2d at 1022-23. When Mickelson tried to block the officers' entry, one of the officers grabbed Mickelson's arm and a fight ensued. *Id.* at 1022. Mickelson was then charged with felony interference with a peace officer and convicted on the lesser charge of misdemeanor interference. *Id*. This Court reversed the conviction, explaining:

> The legality of Mickelson's arrest, however, is elemental to his alleged crime. Interference with a peace officer is not a crime unless the officer is "engaged in the lawful performance of his official duties." Wyo.Stat. § 6–5–204(a) and (b). Officer Ernst was not lawfully in the Fireside, ergo Mickelson's conviction cannot stand.

*Mickelson*, 906 P.2d at 1023.

[¶36] *Mickelson* does not countenance the use of force against a police officer in the event the officer acts unlawfully in performing his official duties. *Mickelson* recognizes that unlawful performance is a defense to an interference charge, but it does not sanction use of force or self defense against a peace officer upon a finding of unlawful performance. The precondition the law imposes for a claim of self defense against a peace officer is not merely a finding of unlawful performance but a finding that the officer used excessive force.[2] The revised self defense instructions proposed by Mr.

---

[2] This distinction makes sense. Massachusetts has similarly held that a person has no right to use force against an unlawful entry by police unless the police use excessive or unnecessary force against the person. *Commonwealth v. Gomes*, 795 N.E.2d 1217, 1224 (Mass. App. Ct. 2003). In so holding, the Massachusetts court observed:

> The *Moreira* rationale is equally compelling in the context of resistance to possibly unlawful entry by police in the performance of their duties. As with the lawfulness of an arrest, the lawfulness of police entry into a residence often presents close and peculiarly fact-dependent questions as to which lawyers and even judges may disagree. [*Commonwealth v. Moreira*, 388 Mass. 596, 600, 447 N.E.2d 1224 (1983)]. *See Commonwealth v. Forde*, 367 Mass. at 805, 329 N.E.2d 717 (distinction between entry to search and entry to arrest is slight); *Commonwealth v. Pietrass*, 392 Mass. at 897 n.8, 467 N.E.2d 1368 (for purposes of Fourth Amendment, no difference whether search of home is for a person or a thing). Such questions, which are only resolved later with the benefit of dispassionate reflection, are particularly ill-suited to the split-second judgments required of police in their interactions with the citizenry. "Such a close question is more properly decided by a detached magistrate rather than by the participants in what may well be a highly volatile imbroglio." *Commonwealth v. Moreira*,

12

Tingey did not make this distinction and so those instructions again misstated the law. The district court therefore did not err in refusing the revised self defense instructions.

### b.     Search and Seizure Instructions Offered by Defense

[¶37]  We turn next to the district court's refusal of Mr. Tingey's proposed Instruction C, which was a verbatim quote of Article 1, Section 4 of the Wyoming Constitution.  Mr. Tingey presents several arguments concerning the grounds for warrantless entry of a home, and warrantless arrest of a person, and during both the direct and cross-examination of the officers during the trial, there was testimony concerning the officers' understanding of the United States Constitution and their perception of the exigent circumstances.  Proposed Instruction C, however, spoke to none of those questions.  The proposed instruction provided no guidance to the jurors concerning probable cause for obtaining a warrant or the parameters of a warrantless entry or arrest.  Because the instruction provided no direction on the questions relating to Mr. Tingey's defense, we agree with the district court that it would have done no more than create confusion.

### 2.     Allegation of Plain Error in Failure to Give Theory of Defense Instructions

[¶38]  Mr. Tingey asserts that the district court committed plain error in failing to *sua sponte* provide appropriate theory of defense instructions to the jury.  This claim is loosely asserted and we are hampered in our plain error review because, while Mr. Tingey asserts plain error, he provides no plain error analysis and has not identified the instructions he contends the district court should have given.  We would typically decline any further review under these circumstances, but because of the due process implications surrounding theory of defense instructions, we will address the plain error claim.

[¶39]  We presume from the nature of Mr. Tingey's defense and his arguments on appeal that the instructions he contends should have been given would provide a framework to

---

388 Mass. at 600, 447 N.E.2d 1224. If a police officer makes an entry into a dwelling, with or without a warrant, that is ultimately determined to be unlawful, the remedy is to be found in the courts. *Ibid.*

* * * [T]he rule the defendants would have us espouse, that an individual may forcibly resist an entry by police that is later determined to be unlawful, would encourage violence and erode the very security that our Federal and State Constitutions are designed to protect. Indeed, resistance would frequently result in far graver consequences for both the officer and the occupant than the unlawful intrusion itself. * * *

*Gomes*, 795 N.E.2d at 1225 (citations omitted); *see also Roberts v. State*, 711 P.2d 1131, 1134 (Wyo. 1985) ("Even if the person arrested is absolutely certain that his arrest is a mistake, he should nevertheless cooperate with the arresting officer and employ remedies available through the judicial system.").

13

assist the jury in determining whether the officers were engaged in the lawful performance of their official duties. More particularly, those instructions may have instructed the jury on the circumstances that justify a warrantless entry or arrest, and they may have instructed that self defense against a peace officer is permitted if the peace officer uses excessive force. While any of these instructions may have properly been given to the jury if requested, we cannot find plain error in the district court's failure to give them *sua sponte*.

[¶40] As we indicated above, to establish plain error, Mr. Tingey must show there was a "clear-cut requirement" that the instruction at issue be given and a reasonable possibility that the jury verdict would have been more favorable had the instruction been given. *Vaught*, ¶ 14, 366 P.3d at 516. Because theory of defense instructions implicate due process concerns, a court must give such an instruction if there is any competent evidence to support the theory. *James*, ¶ 18, 357 P.3d at 105 (citing *Nelson*, ¶ 14, 245 P.3d at 285-86). The evidence must be viewed in the light most favorable to the defense, and even evidence that is weak, or unworthy of belief, is sufficient if a jury could reasonably conclude the evidence supports the defendant's position. *Id*. If an instruction is not a theory of defense instruction, the district court's decision to give the instruction is discretionary:

> * * * We review a district court's decision on jury instructions for an abuse of discretion. *Adekale v. State*, 2015 WY 30, ¶ 37, 344 P.3d 761, 770 (Wyo. 2015) (quoting *Budder v. State*, 2010 WY 123, ¶ 7, 238 P.3d 575, 577 (Wyo. 2010)). District courts have substantial latitude to tailor jury instructions to the facts of the case. *Id*. "A trial court does not abuse its discretion by referring the jury to instructions that, when viewed as whole and in the context of the entire trial, fairly and adequately cover the issues." *Id*.

> The following is also instructive when reviewing a district court's decision regarding jury instructions:

> > When we review claims of error involving jury instructions, the district court is afforded significant deference. *Luedtke v. State*, 2005 WY 98, ¶ 28, 117 P.3d 1227, 1232 (Wyo.2005). A district court is "given wide latitude in instructing the jury and, as long as the instructions correctly state the law and the entire charge covers the relevant issue, reversible error will not be found." *Id*. (citations omitted); *see also Hawes v. State*, 2014 WY 127, ¶ 15, 335 P.3d 1073, 1078 (Wyo.2014). Its ruling on an instruction must be prejudicial to constitute

14

reversible error. *Heywood v. State*, 2007 WY 149, ¶ 26, 170 P.3d 1227, 1234 (Wyo.2007) (citation omitted), *abrogated on other grounds by Granzer v. State*, 2008 WY 118, 193 P.3d 266 (Wyo.2008). Because the purpose of jury instructions is to provide guidance on the applicable law, prejudice will result when the instructions confuse or mislead the jury. *Id*.

*Brown v. State*, 2015 WY 4, ¶ 40, 340 P.3d 1020, 1031 (Wyo. 2015).

*Dougherty v. State*, 2016 WY 62, ¶¶ 10-11, 373 P.3d 427, 431 (Wyo. 2016).

a.      **Excessive Force Instruction**

[¶41]  We address first the alleged error in the district court's failure to instruct the jury on the law governing self defense in response to a peace officer's use of excessive force. At the outset, we reject Mr. Tingey's assertion that this was a theory of his defense.  In our record review, we found no argument to the district court or the jury that the officers who entered Mr. Tingey's home used excessive force.  Indeed, the index to the trial transcript shows only one use of the word "excessive," and that is when the district court explained its basis for rejecting Mr. Tingey's proffered self defense instruction.  The defense theory, the one argued to the jury, was not excessive force but was instead the alleged unlawfulness of the officer's entry of Mr. Tingey's home:

> Someone's not going to come into your house, even if they're wearing blue and a badge and guns or all of the junk that they wear when they testify here, they're not coming to your house and saying, "Get out of your house."  You're going to wonder why.  If it makes sense, you get out.  But if you say, "Get out of your house" at the same time you're grabbing them and throwing them to the ground, the fight is going to be on.  Whether you're drunk, whether you've smoked dope, whether there's dope in your house or not, the fight's going to be on because they're not in the lawful performance of their duties.  And that's, Ladies and Gentlemen, why we believe those three counts have to fail because those officers were not acting lawfully.
> There's something that is just underlying this whole mess of stuff.  Because we're a country of laws and those laws apply to us; those laws apply to law enforcement officers; they apply to all of us.  And our country is great and functions well when you all function under the law.  And we

15

are a country of laws. But what happens when the sanctity of the home or the sanctity of being in your own living room is violated? Are we losing out that fact of being a country of laws? Are we becoming a police state where the police are above the laws, that they can do what they want? * * * We still need to be a country of laws because the bad thing about power, and we all know this, is power corrupts. And people in power will abuse that power and misuse that power and that's not what's made our country great.

Ladies and Gentlemen, there is not sufficient evidence that Mr. Tingey was attempting to cause bodily injury to Ms. Wisenbaker. He was wanting her to get out of the house and she was refusing. There is not evidence before you that those officers were engaged in the lawful performance of their duties. They came up to that door and immediately decided to go into that house. They forced their way into that house after being told not to come into the house and they immediately put hands on Mr. Tingey that initiated the physical contact that initially was applied. That's just wrong; and we ask you to find him not guilty of the charges.

[¶42] Given that Mr. Tingey did not put the question of excessive force in issue, it is difficult to find a clear-cut requirement that an instruction be given on the question. Additionally, the record contains virtually no evidence from which the jury could reasonably conclude that Mr. Tingey's actions were in response to a use of excessive force. Ms. May testified that the officers barged in, pushed her to the side, and tackled Mr. Tingey. She also testified, however, that she was intoxicated, that alcohol affected her memory, and that everything happened very fast when the officers entered. On cross-examination, she agreed that the officers did not push or shove her, but brushed against her, and she testified that while she was at the front door she was telling Mr. Tingey to calm down.

[¶43] None of Ms. May's testimony points to excessive force. Her testimony is in fact consistent with that of Sergeant Sheets and Officer Robbins who likewise testified the altercation happened quickly, immediately when they each placed a hand on one of Mr. Tingey's arms. Additionally, her testimony that she was trying to calm Mr. Tingey fits with the testimony of Sergeant Sheets and Officer Robbins that Mr. Tingey was aggressive when they entered the home. Finally, her testimony did not contradict that of Sergeant Sheets and Officer Robbins that before the altercation started their first contact was Sergeant Sheet's hand on Mr. Tingey's left arm and Officer Robbins' hand hold on Mr. Tingey's right wrist. The evidence simply does not add up to excessive force that would justify Mr. Tingey's violent outburst. *See CG*, ¶ 15, 248 P.3d at 190 (upholding

16

finding that officer's application of compliance grip to defendant, which hurt her "a little," and physically pulling her from van, was not excessive force).

[¶44] Given the evidence, and the focus of the defense arguments, we are unable to find that there was a clear-cut requirement that an excessive force instruction be given, and we therefore find no plain error in the district court's failure to give the instruction. We turn then to the assertion of plain error in the district court's failure to instruct the jury on the circumstances that would justify a warrantless entry and arrest.

### b.    Lawful Performance Instructions

[¶45] As discussed previously, whether the officers were lawfully performing their official duties when Mr. Tingey caused them bodily injury went to the heart of Mr. Tingey's defense against the interference charges. Instructions that would have defined the circumstances under which a warrantless entry and arrest could be made were therefore theory of defense instructions. As such, there would have been a clear requirement to give the instructions if there was any competent evidence based on which the jury could reasonably have found the entry and arrest were unlawful.

[¶46] All of the officers testified that they had the training and/or experience to recognize the smell of burnt marijuana and they recognized the smell of burnt marijuana emanating from inside Mr. Tingey's home after he opened the front door.[3] The officers made the decision to get a search warrant based on probable cause that a controlled substance, marijuana, would be found in the home. The officers also testified that the exigent circumstances that prompted their warrantless entry of the home was their concern that the marijuana would be destroyed while they waited for a search warrant.

[¶47] The odor of burnt marijuana emanating from a home is sufficient to establish probable cause for a warrant to search the premises. *Rideout v. State*, 2005 WY 141, ¶ 17, 122 P.3d 201, 205 (citing *Gompf v. State*, 2005 WY 112, ¶ 20, 120 P.3d 980, 986 (Wyo. 2005)). While the odor of burnt marijuana may provide probable cause for a search warrant, the warrantless entry of a home is not permitted unless the occupant of the home consents to the entry or an exigent circumstance justifies the warrantless entry. *Pena v. State*, 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo. 2004). In order for the exigent circumstance exception to apply, the government must establish that the officers had probable cause for the search and that exigent circumstances made it impracticable to obtain a warrant before conducting the search. *Miller v. State*, 2009 WY 125, ¶ 11, 217 P.3d 793, 799 (Wyo. 2009). "Among the exigent circumstances justifying a warrantless search is a need 'to prevent the imminent destruction of evidence.'" *Id*. (quoting *Pena*, ¶ 29, 98 P.3d at 870).

---

[3] The exception was Officer Robbins who testified that he recognized the smell of marijuana emanating from inside the front of the home but he could not tell if the marijuana was burnt or unburned.

[¶48] In *Rideout*, we found a warrantless entry justified by the need to prevent destruction of the evidence, namely marijuana. *Rideout*, ¶ 24, 122 P.3d at 208. In *Miller*, we explained our application of that exigent circumstance:

> We applied the exigent circumstances exception to a warrantless entry in *Rideout v. State*, 2005 WY 141, 122 P.3d 201 (Wyo.2005). In *Rideout*, officers went to the defendants' residence to investigate drug-related activities. As they exited their vehicles, they smelled burning marijuana coming from the residence, and the officers realized "their presence was known to the occupants." *Id.*, ¶¶ 5, 24, 122 P.3d at 203, 208. At that point, officers decided to enter the house and secure it to prevent the destruction of evidence before seeking a search warrant. *Id.*, ¶ 7, 122 P.3d at 203. We affirmed the denial of the motion to suppress and found no Fourth Amendment violation because: (1) officers possessed probable cause that a crime was being committed within the residence; (2) exigent circumstances justified the warrantless entry to secure the residence and prevent destruction of any evidence; and (3) the officers refrained from searching the home until they had authorization—either in the form of consent or a search warrant. *Id.*, ¶ 25, 122 P.3d at 208.

*Miller*, ¶ 12, 217 P.3d at 799.

[¶49] This case presents a similar set of facts. It is undisputed that law enforcement was legitimately called to Mr. Tingey's home in response to a report of family violence. The evidence is also undisputed that once Mr. Tingey opened his front door, the odor of marijuana emanating from the home was detected. As in *Rideout*, the officers were confronted with probable cause to believe that illegal drugs were present in the home and that the occupants of course knew of law enforcement's presence, making destruction of the evidence a very real and legitimate concern. To further those concerns, Mr. Tingey repeatedly shut the door on the officers and when the door was left open to allow the officers to speak with Ms. May, Mr. Tingey could be viewed moving back and forth and clearing items from surfaces in the home.

[¶50] Mr. Tingey nonetheless contends that these concerns of evidence destruction should be disregarded as justification for the warrantless entry because the officers created the exigent circumstance themselves by invading his private space in violation of his Fourth Amendment rights. *See Kentucky v. King*, 563 U.S. 452, 463, 131 S.Ct. 1849, 1858, 179 L.Ed.2d 865 (2011) (exigent circumstance justifies warrantless entry so long as police did not create exigency by engaging in conduct that violates the Fourth

Amendment). Specifically, Mr. Tingey asserts that to detect the odor of marijuana at his back door, Officers Robbins and West had to intrude on a private space, one that was blocked from public view. It is this unlawful intrusion, he claims, which created the exigency. We disagree.

[¶51] First, the back door was not protected by a fenced off or blocked off area as suggested by Mr. Tingey's argument. The officers testified that the back door was adjacent to the driveway and they simply walked up the driveway to reach the back door.[4] Moreover, the officers approached the back door for a legitimate investigatory reason. They were called to respond to a family violence report and there was initially no response to the other officers who were knocking at the front door. Officers Robbins and West approached the back door for the sole purpose of looking for occupants and to ensure the entire house was accounted for. Finally, the odor of marijuana that prompted the officers to obtain a search warrant and make a warrantless entry was detected at both the front and back entrances, and more particularly by all four officers at the front entrance. The odor at the back entrance was thus not the sole cause for the warrant or the sole justification for the warrantless entry. The officers plainly did not create the exigency by their own conduct.

[¶52] With regard to the officers' warrantless entry into the home, the evidence supports only one conclusion: exigent circumstances justified the warrantless entry. It follows that had the jury been instructed on the definition of exigent circumstances, it is unlikely that the instruction would have affected their verdict. We thus find no plain error in the district court's failure to provide the warrantless entry instruction, both because there was no clear-cut requirement that the instruction be given and because Mr. Tingey has not established a reasonable possibility that the jury verdict would have been more favorable had the instruction been given.

[¶53] With regard to the warrantless arrest of Mr. Tingey, we have held that "[p]robable cause for a warrantless arrest exists when, under the totality of the circumstances, a prudent, reasonable, and cautious peace officer would be led to believe that a crime has been or is being committed and that the individual arrested is the perpetrator." *McCallie v. State ex rel. Wyo. Dep't of Transp.*, 2014 WY 18, ¶ 7, 317 P.3d 1142, 1145 (Wyo. 2014) (quoting *Keehn v. Town of Torrington*, 834 P.2d 112, 116 (Wyo. 1992)). The evidence is again undisputed that when officers entered Mr. Tingey's home, they did so not for the purpose of arresting him but for the purpose of clearing and securing the residence. The decision to arrest Mr. Tingey was made only after he became physically violent with the officers. At that point, the officers certainly had a reasonable belief Mr. Tingey was committing a crime.

---

[4] This was also where Tara Wisenbaker had parked and entered the home when she came to check on Ms. May that evening.

[¶54]  Given the evidence in support of the decision to make a warrantless entry of Mr. Tingey's home, and the ensuing circumstances that justified his warrantless arrest, we are again unable to find that there was a clear requirement that the jury be instructed on the grounds for a warrantless entry and arrest.  We further find, based on the overwhelming evidence, that such an instruction would have been unlikely to affect the verdict against Mr. Tingey.  We thus find no plain error in the district court's failure to give an instruction on these matters.

## II.      Ineffective Assistance of Counsel

### A.      Standard of Review

[¶55]  "Claims of ineffective assistance of counsel involve mixed questions of law and fact and are reviewed *de novo*."  *Mraz v. State*, 2016 WY 85, ¶ 42, 378 P.3d 280, 290 (Wyo. 2016) (quoting *Castellanos v. State*, 2016 WY 11, ¶ 95, 366 P.3d 1279, 1304 (Wyo. 2016)).

### B.      Analysis

[¶56]  This Court evaluates claims of ineffective assistance of counsel according to the following framework:

> A defendant challenging the effectiveness of counsel bears the burden of proving that ineffectiveness. *Luftig v. State*, 2010 WY 43, ¶ 17, 228 P.3d 857, 864 (Wyo. 2010) (citing *Rutti v. State*, 2004 WY 133, ¶¶ 22–23, 100 P.3d 394, 405 (Wyo. 2004)). Based on our adoption of the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the defendant must prove both that counsel's performance was deficient, and that the defendant was prejudiced by the deficient performance. *Galbreath v. State*, 2015 WY 49, ¶ 4, 346 P.3d 16, 18 (Wyo. 2015) (citing *Frias v. State*, 722 P.2d 135, 145 (Wyo. 1986)). The defendant's burden is a heavy one, as we have explained:
>
>> When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. We indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Under

the two-prong standard articulated in *Strickland*, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to render such assistance as would have been offered by a reasonably competent attorney and that counsel's deficiency prejudiced the defense of the case. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

*Luftig*, ¶ 17, 228 P.3d at 864 (quoting *Dettloff v. State*, 2007 WY 29, ¶ 18, 152 P.3d 376, 382 (Wyo. 2007) (internal citations omitted)).

*Mraz*, ¶ 43, 378 P.3d 291.

[¶57]  We have also stated:

An ineffective assistance claim has a performance component and a prejudice component. The components are mixed questions of fact and law. A court does not have to approach the inquiry by addressing performance first and prejudice second. A court does not have to address both components if the appellant makes an insufficient showing on one. If a court determines it is easier to dispose of the claim because sufficient prejudice is lacking, the court may do so.

*Castellanos*, ¶ 96, 366 P.3d at 1304 (quoting *Eaton v. State*, 2008 WY 97, ¶ 132, 192 P.3d 36, 92 (Wyo. 2008)).

[¶58]  Mr. Tingey argues that he was denied effective assistance of counsel because his counsel failed to file a motion to suppress, failed to renew the motion for judgment of acquittal at the end of trial, and failed to propose appropriate theory of defense instructions.  While Mr. Tingey asserts three grounds for his ineffective assistance of counsel claim, he does not separately address each ground, and his argument is essentially a recasting of his argument that the officers acted unlawfully when they entered Mr. Tingey's home without a warrant and then arrested him without a warrant. Because these arguments are no different than those we already addressed, we resolve them on essentially the same ground.  Mr. Tingey has not shown that counsel's failure to file a motion to suppress, to renew the defense motion for judgment of acquittal, and to offer appropriate theory of defense instructions prejudiced his defense.  As previously

discussed, the evidence plainly establishes that the officers lawfully entered Mr. Tingey's home and lawfully arrested him. This result would not have been changed by a motion to suppress, a renewed motion for judgment of acquittal, or additional jury instructions.

## **CONCLUSION**

[¶59]   The district court did not err in instructing the jury, and Mr. Tingey was not denied effective assistance of counsel. Affirmed.