2017 WY 140

Terry Laverne SCHMUCK, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

S-16-0175
S-17-0037

Supreme Court of Wyoming.

November 30, 2017

288

Representing Appellant: Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General. Argument by Ms. Martens.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

FOX, Justice.

[¶1] Appellant, Terry L. Schmuck, appeals his conviction of attempted second-degree murder. Mr. Schmuck claims that the district court improperly instructed the jury regarding sudden heat of passion, the definition of "malice" in the context of first-degree murder, the definition of "maliciously" in the context of second-degree murder, an aggressor's right to use self-defense, and the duty to retreat before asserting the right of self-defense. We affirm.

## ISSUES

[¶2] Mr. Schmuck raises one issue: Did the district court's failure to properly instruct the jury deprive Mr. Schmuck of a fair trial? For clarity, we divide his issue into six separate issues, restated as follows:

I. Did the district court err when it:

A. failed to instruct the jury that the State must prove beyond a reasonable doubt the absence of a sudden heat of passion in order for the jury to find Mr. Schmuck guilty of first-degree or second-degree murder?

B. failed to instruct the jury that "malice" for purposes of first-degree murder means the defendant acted intentionally without legal justification or excuse and with hatred, ill will, or hostility?

C. for the purposes of second-degree murder:

 1. provided the jury with a definition of both "malice" and "maliciously"?

 2. failed to define "recklessly" or "recklessly under circumstances manifesting an extreme indifference to the value of human life"?

D. used the term "provokes" to instruct the jury on an aggressor's right of self-defense?

E. instructed the jury that Mr. Schmuck had an absolute duty to retreat before using deadly force?

II. Did the cumulative error of two or more improper jury instructions deprive Mr. Schmuck of his right to a fair trial?

## FACTS

[¶3] Mr. Schmuck struck his wife, Cindy Schmuck, in the head with a hatchet. The blow fractured her skull and caused an underlying hemorrhage into the brain. The State charged Mr. Schmuck with one count of attempted murder in the first degree. The trial court also instructed the jury on the lesser included offenses of attempted murder in the second degree and attempted voluntary manslaughter.

[¶4] In the months preceding the incident, Mr. and Mrs. Schmuck's fourteen-year marriage had been deteriorating, and they had already discussed the terms of a divorce. An argument eleven days earlier in the parking lot of a horse arena, however, was the first of several events that culminated in Mr. Schmuck's assault. Mrs. Schmuck testified that, in the front seat of their parked car, Mr. Schmuck "drew back and almost punched me in the face" and "told me he was going to kill me."[1] After this exchange, Mr. Schmuck exited the car and walked away. Mrs. Schmuck called law enforcement and

---

1. Mr. Schmuck did not dispute that he threatened to kill Mrs. Schmuck. However, he testified that he made the threat only when Mrs. Schmuck reached for her purse where she keeps a gun, and he responded: "If you pull that gun out of the purse, I'll kill you."

eventually obtained an Ex Parte Order of Protection which, among other things, prohibited Mr. Schmuck from contacting Mrs. Schmuck or entering the family home. Mrs. Schmuck also instructed their two children, JES and CAS, to refrain from communicating with their father.

[¶5] On the morning of May 28, 2015, Mr. and Mrs. Schmuck appeared in circuit court for a hearing on the protection order. Mrs. Schmuck's lawyer could not attend, however, and the court continued the hearing for two weeks. Mr. and Mrs. Schmuck could not agree upon a visitation arrangement at this time and, thus, Mr. Schmuck would be unable to see his children until the court revisited the matter at the rescheduled hearing two weeks later.

[¶6] After the hearing, Mrs. Schmuck returned with the children to the family home, while Mr. Schmuck went to see his lawyer, who gave him a copy of the divorce paperwork that Mrs. Schmuck had recently filed. Upon reading Mrs. Schmuck's requested divorce terms, Mr. Schmuck became upset. Mrs. Schmuck was asking for sole custody of the children, supervised visitation for Mr. Schmuck, spousal support, and, according to Mr. Schmuck, "all the property." Mr. Schmuck stated that these were not the terms to which they had previously agreed.

[¶7] That night, as Mr. Schmuck re-read the divorce paperwork, he became increasingly agitated. Mr. Schmuck explained in a police interview that Mrs. Schmuck "want[ed] pretty much everything, and full custody and sole custody and everything, and I lost it." Mr. Schmuck stated that Mrs. Shmuck was "going for everything," she would not text him back to discuss it, and everything "built up." Mr. Schmuck wanted "just an acknowledgement" from Mrs. Schmuck that she had received his texts, but she "wouldn't even give [him] that after fifteen years [of marriage]."

[¶8] Mr. Schmuck therefore decided to drive to the family home to "confront" Mrs.

Schmuck. As he walked out the door to the car, he picked up a hatchet that he used for camping and hunting. Mr. Schmuck testified that he grabbed the hatchet because: "I was just pissed off. I—I really don't know. I was—I just wasn't thinking." He threw the hatchet on the floorboard on the passenger side of the car and started driving to the family home approximately twenty miles away. Mr. Schmuck testified that he calmed down as he drove, but still continued to the house so he could talk to Mrs. Schmuck about the divorce.

[¶9] Once he arrived, Mr. Schmuck parked the car approximately 50-75 feet down the road from the home. Taking the hatchet with him, Mr. Schmuck climbed over a wooden fence into the yard. He proceeded to the phone box on the exterior wall of the house and used the hatchet to cut the phone lines into the home. Meanwhile, inside, the children were asleep. Mrs. Schmuck was in her bedroom talking on the landline telephone to a friend when she heard their dogs barking outside. When Mr. Schmuck cut the lines, her telephone went dead. Mrs. Schmuck noticed that the dogs were still barking, so she locked all the doors and turned on the back porch light. After checking on the children, Mrs. Schmuck retrieved her .17 HMR handgun—a pistol they kept in the house for shooting "coyotes or racoons or whatever vermin happen to be floating around the house"—and retreated to her bedroom, where she grabbed her tablet computer to send an online message to her friend for help. Moments later, she heard a crash. Mrs. Schmuck testified: "I knew right then that something was horribly, horribly wrong. And I grabbed the pistol. I went around the end of the bed as quickly as I could and got to the [bedroom] doorway."

[¶10] The crash that Mrs. Schmuck had heard was Mr. Schmuck—with hatchet in hand—breaking in the front door. Once inside the home, Mr. Schmuck yelled out at Mrs. Schmuck.[2] Mr. Schmuck proceeded through the kitchen and was nearing Mrs.

---

2. There was conflicting testimony as to what Mr. Schmuck yelled as he entered the home. Mrs. Schmuck testified that Mr. Schmuck "screamed at me in a voice I've never, ever heard before, 'I'm going to kill you, you f—ing bitch.'" JES

testified that she heard her father "screaming through our house that 'I'm going to kill you' to my mom." Mr. Schmuck testified that he yelled, "Cindy, why are you doing the divorce this way?"

Schmuck's bedroom when Mrs. Schmuck, still in the doorway, aimed her pistol at him and pulled the trigger three times. But, to her surprise, the gun was not loaded. Mr. Schmuck testified that once Mrs. Schmuck started "shooting" at him, he pushed her away, and punched her while still holding the hatchet "up by the head, on the handle" in his punching hand. Mr. Schmuck testified that Mrs. Schmuck then fell backwards and laid unconscious for 10-15 seconds.

[¶11] Mrs. Schmuck had no memory of Mr. Schmuck striking her. When she regained consciousness, she was bleeding extensively and in need of medical attention, and Mr. Schmuck agreed to take her to the hospital. In the hectic minutes before leaving, Mr. Schmuck threw the hatchet into the basement to hide it. JES testified that Mr. Schmuck flipped on the light in her bedroom and told her, "[t]his is what we wanted."[3] Mrs. Schmuck instructed JES to contact the sheriff's department as soon as they left.

[¶12] At the hospital, a CT scan revealed that Mrs. Schmuck had a depressed skull fracture with an underlying hemorrhage into the brain. Because of the severity of her injuries, the hospital transported her by air to a trauma care facility. There, a neurosurgeon performed surgery and inserted a cap on her brain to protect it. Mrs. Schmuck testified at trial that she continued to suffer mental, emotional, and physical effects from the injury.

[¶13] Soon after Mr. and Mrs. Schmuck arrived at the hospital, sheriff's deputies arrested Mr. Schmuck. A few hours later, Detective Granlund of the Fremont County Sheriff's Office conducted an investigatory interview of Mr. Schmuck at the Fremont County Detention Center, which was video-recorded and played for the jury. After providing Miranda warnings and obtaining biographical information, Detective Granlund asked Mr. Schmuck what happened. Mr. Schmuck began by explaining that he had received the divorce paperwork that indicated Mrs. Schmuck "want[ed] pretty much everything, and full custody and sole custody and everything, and I lost it, and I went out

there to confront her and she pulled a pistol." Mr. Schmuck maintained that he pushed Mrs. Schmuck to defend himself, which caused her to fall.

[¶14] Detective Granlund did not believe Mr. Schmuck's story and told him so: "Here's the deal, OK? That's not how she got hurt. I know that ... the doctors know that. OK? So I need to know what happened. ... Lying's not going to help anybody here." Mr. Schmuck immediately replied:

A. I tried to kill her with a hatchet.

Q. Where's the hatchet now?

A. In the basement.

. . . .

Q. Tried to kill her with it—so you brought it from the house?

A. Yes.

Q. With the intent?

A. No.

Q. What'd you bring it for?

A. I don't know.

[¶15] Detective Granlund continued to explore Mr. Schmuck's state of mind:

Q. So—just [you were] upset.

A. Yeah.

Q. Mad—because you were getting screwed over with these papers.

A. For years she accused me of killing her—or wanting to kill her—so, you want to accuse me?—I just lost it.

[¶16] A few minutes later, Detective Granlund returned to the line of questioning:

Q. Why did you have the hatchet with you?

A. Because.

Q. Because you were going to hit her with it? When did you decide you were going to hit her with that hatchet?

A. I knew when I took off from the house.

Q. When you took off from the house you knew you'd go out there and hit her with the hatchet. OK.

[¶17] Detective Granlund later summarized:

3. Mr. Schmuck denied making that statement and testified that, instead, he told the children

that their mother tried to shoot him and they were going to the hospital.

Q. So when you left the house—when you left ... to go out there—I mean, you were upset, you were mad.

A. Yeah.

Q. And you took the hatchet because you were going to kill her.

A. Yeah.

### Jury Instructions

[¶18] The State charged Mr. Schmuck with one count of attempted murder in the first degree. The district court also instructed the jury on the lesser included crimes of attempted murder in the second degree, offered by both the State and Mr. Schmuck, and attempted voluntary manslaughter, offered by Mr. Schmuck only. At the formal jury instruction conference, the State objected to the self-defense instructions offered by Mr. Schmuck, arguing that he had not established a prima facie case of self-defense sufficient to warrant the instructions. The court gave the instructions over the State's objection. Mr. Schmuck objected to the court instructing the jury on both the definitions of "malice" and "maliciously" in the context of second-degree murder. Because the actual term used in the element instruction was "maliciously," Mr. Schmuck argued that "malice" should not be defined. The court overruled the objection. Mr. Schmuck did not object to any other instructions. However, Mr. Schmuck argued that, when instructing the jury that an aggressor "who provokes the conflict" loses the right of self-defense until he withdraws, the term "provokes" is a term of art and, therefore, should be defined for the jury. The court declined to define "provokes" for the jury.

[¶19] The district court gave the jury the following instructions relevant to the issues on appeal:

### INSTRUCTION NO. 13

The pertinent elements of the crime of Murder in the First Degree are:

. . . . . . . . .

3. a person,

4. purposely

5. with premeditated malice,

6. killed another human being,

### INSTRUCTION NO. 14

As used in Instruction No. 13:

"Purposely" means intentionally.

"Premeditated malice" means that the Defendant thought about and considered the idea of killing before the act which caused death was committed, and that the act which caused death was done with intent to kill and without legal justification or excuse.

"Premeditated" requires an interval sufficient to form the intent to kill before the commission of the act intended to result in death.

### INSTRUCTION NO. 15

If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the offense of Attempted Murder in the First Degree as charged in Count 1 of the Information, he may, however, be found guilty of any lesser offense, the commission of which is necessarily included in the offense charged, if the evidence is sufficient to establish his guilt of such lesser offense beyond a reasonable doubt.

The offense of Attempted Murder in the First Degree, with which the defendant is charged, also includes the lesser offense of Attempted Murder in the Second Degree and Attempted Voluntary Manslaughter.

### INSTRUCTION NO. 17

The pertinent elements of Second Degree Murder are:

. . . . . . . . .

3. a person,

4. Purposely and,

5. Maliciously,

6. Killed a human being.

### INSTRUCTION NO. 18

As used in Instruction No. 17 the term "malice" means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, and that the act was done without legal justification or excuse.

The term "maliciously" means that the act constituting the offense was done intentionally but without premeditation, was reasonably likely to result in death and

was done recklessly under circumstances manifesting an extreme indifference to the value of human life, and was done without legal justification or excuse.

### INSTRUCTION NO. 19

The elements of the lesser included offense Attempted Voluntary Manslaughter are:

1. On or about the 28th day of May, 2015,

2. In Fremont County, Wyoming,

3. The Defendant, Terry Laverne Schmuck, (Y.O.B. 1969),

4. Intending to commit the crime of Voluntary Manslaughter,

5. Did an act which was a substantial step towards committing the crime of Voluntary Manslaughter.

As used in this Instruction, a substantial step means conduct which is strongly corroborative of the firmness of the defendant's intention to complete the commission of the crime.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

### INSTRUCTION NO. 20

The pertinent elements of Voluntary Manslaughter are:

. . . . . . . . .

3. A person,

4. Voluntarily,

5. Upon a sudden heat of passion,

6. Killed another human being.

### INSTRUCTION NO. 22

As used in Instruction No. 20 "sudden heat of passion" means such passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question which would cause him to act rashly, without reflection or deliberation, and from passion rather than from judg-

ment. The heat of passion must be aroused suddenly, and the act resulting in death must occur while the defendant was acting under the direct and immediate influence of such heat of passion, and before sufficient time has elapsed to permit the heat of passion to cool.

[¶20] The district court used a stepped verdict form, instructing the jury that it need not proceed to consider lesser included offenses if it found the defendant guilty of the greater offense. Additional instructions will be discussed when relevant to our analysis.

### *Verdict and Post-Trial*

[¶21] The jury found Mr. Schmuck guilty of attempted murder in the second degree. The district court denied Mr. Schmuck's motion for a new trial based on various issues, only one of which is relevant to this appeal: the district court's instruction to the jury on the definition of both "malice" and "maliciously" in the context of second-degree murder. The court sentenced Mr. Schmuck to incarceration for thirty years to life. Mr. Schmuck subsequently filed a motion claiming ineffective assistance of counsel pursuant to W.R.A.P. 21. After a hearing, the court denied the motion. Mr. Schmuck timely perfected this appeal.

### *DISCUSSION*

**I. *Did the jury instructions result in prejudicial error?***

**A. Did the district court err when it failed to instruct the jury that the State must prove beyond a reasonable doubt the absence of a sudden heat of passion in order for the jury to find Mr. Schmuck guilty of first-degree or second-degree murder?**

[¶22] Mr. Schmuck contends that, under our recent decision in *Shull v. State,* 2017 WY 14, 388 P.3d 763 (Wyo. 2017), the jury was incorrectly instructed on the burden of proof for "sudden heat of passion," and that the error is reversible regardless of prejudice because it is structural error. The State concedes that our ruling in *Shull* requires reversal of Mr. Schmuck's conviction, but

urges us to reconsider *Shull* in two ways: first, to return "sudden heat of passion" to its rightful place as part of an element of voluntary manslaughter rather than a mitigator to first- or second-degree murder; and, second, to review allegations of such error in our usual framework for claims of instructional error, rather than as structural error.

[¶23] In *Shull*, the defendant was charged with first-degree murder, second-degree murder, and voluntary manslaughter. 2017 WY 14, ¶ 19, 388 P.3d at 767. The district court declined to give the italicized language of Mr. Shull's requested instruction defining "malice" as:

> The term "malice" means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, that the act was done without legal justification or excuse, *and that the act was not done upon a sudden heat of passion.* [Emphasis added.]

*Id.* at ¶ 21, 388 P.3d at 768. The jury was given a stepped verdict form, pursuant to which it was to consider the first-degree murder charge first, and then to proceed to the lesser included offenses only if it found him not guilty. *Id.* at ¶ 26, 388 P.3d at 769. "Because the jury found Shull guilty of first degree murder, it did not answer the questions concerning second degree murder or manslaughter." *Id.*

[¶24] We noted "that it is difficult to imagine a circumstance in which a prosecutor would charge voluntary manslaughter. That would involve proving something about the defendant's state of mind that negated malice." *Shull*, 2017 WY 14, ¶ 28, 388 P.3d at 769. We went on to hold that, once Mr. Shull presented some evidence that he acted in the sudden heat of passion, "the jury should have been told that the State had the burden of proving the absence of a sudden heat of passion ...." *Id.* at ¶ 34, 388 P.3d at 771. Other courts and commentators have recognized the same seeming contradiction, and the majority of them have arrived at the

same common-sense solution. *See, e.g., United States v. Delaney*, 717 F.3d 553, 559 (7th Cir. 2013) (The "seeming oddity" of requiring the government to bear the burden of proving absence of heat of passion beyond a reasonable doubt "just puts the government to its proof."); *United States v. Lesina*, 833 F.2d 156, 160 (9th Cir. 1987) ("We construe *Mullaney* [*v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) ] to require jury instructions for murder to state that the government bears the burden of proving beyond a reasonable doubt the absence of heat of passion or sudden quarrel where that defense is raised."); 2A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions* § 45:03, notes (6th ed. August 2017 update); *State v. Hinrichsen*, 292 Neb. 611, 877 N.W.2d 211, 235 (2016) (Connolly, J., dissenting) ("The majority's assumption that the sudden quarrel defense is presented to the jury and that the jury understands the State has the burden to disprove the defense is nothing more than an implausible legal fiction."). *But see United States v. Molina-Uribe*, 853 F.2d 1193, 1204 (5th Cir. 1988), *overruled on other grounds by United States v. Bachynsky*, 934 F.2d 1349 (5th Cir. 1991), *overruling on other grounds recognized by United States v. Watch*, 7 F.3d 422, 427 (5th Cir. 1993).[4]

[¶25] In *United States v. Lofton*, 776 F.2d 918, 921 (10th Cir. 1985), the government made the same argument the State makes here.

> The core of the Government's argument is that the court implicitly defined malice and heat of passion as mutually exclusive and that the structure of the charge forced the jury to find the presence of malice, and thus the absence of heat of passion, in order to find murder. Together with the reasonable doubt standard, the Government contends, the instructions were sufficient under *Mullaney*.

[¶26] The Tenth Circuit rejected that argument, finding the instructions given there were

---

4. The Fifth Circuit subsequently recognized that "the malice element of the traditional offense of murder implicitly forces prosecutors to *disprove* the existence of adequate provocation when the evidence suggests that it may be present" in *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989).

insufficient to inform the jury that the Government must prove the absence of heat of passion beyond a reasonable doubt. A clear and unambiguous instruction to this effect is the constitutional minimum required by *Mullaney. Cf. Bollenbach v. United States*, 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946) ("A conviction ought not to rest on an equivocal direction to the jury on a basic issue").

*Lofton*, 776 F.2d at 922.

[¶27] A careful reading of *State v. Auchampach*, 540 N.W.2d 808 (Minn. 1995), a case relied upon by the State in *Shull*, actually supports our holding in *Shull*. There, the court held:

> We conclude that when, as in this case, the defendant is charged with premeditated murder and sufficient evidence is adduced at trial for a jury reasonably to infer that the defendant caused the death of another person in the heat of passion, provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances, the *state has the burden to prove beyond a reasonable doubt the absence of heat of passion.*

*Auchampach*, 540 N.W.2d at 818 (emphasis added). The court there found that the jury instructions as a whole adequately instructed the jury of this burden, but there, among other instructions, the following pattern instruction was given:

> CRIMJIG 11.04, entitled "Murder in the First Degree-Premeditation-Murder and Manslaughter Distinguished," provides:
>
> If a person intentionally kills another, the statutes of Minnesota provide that defendant is not guilty of murder if defendant acted in the heat of passion provoked by such words or acts as would provoke a person of ordinary self-control in like circumstances. Such heat of passion, however, is not a complete excuse for the killing of another person. Whoever intentionally causes the death of another in such heat of passion is guilty of manslaughter in the first degree.

*Id.* at 815 n.5. *See also* Cal. Jury Instr.— Crim. 8.50 (September 2017 update) (using similar language).

■ [¶28] We held in *Shull* that the failure to instruct the jury that the State had the burden of proving the absence of a sudden heat of passion was a violation of the due process clause. 2017 WY 14, ¶ 32, 388 P.3d at 771 (quoting *Mullaney*, 421 U.S. at 703-04, 95 S.Ct. at 1892 ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case.")). Although not cited in its brief, the State argued that *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) controls, rather than *Mullaney*. Some commentators have observed that the distinction between the two cases is not immediately apparent;[5] however, it seems clear that *Mullaney* controls, under these facts and Wyoming law. The Maine statutes at issue in *Mullaney*, like the Wyoming statutes here, included malice as an element of murder,[6] and defined manslaughter as excluding malice aforethought. In contrast, the New York murder statute in *Patterson* did not include malice in its definition of murder.[7] Instead,

---

**5.** 1 Wayne R. LaFave, Substantive Criminal Law § 1.8 (2d ed. October 2017 update) ("[S]uffice it to note here that some commentators have found it impossible to reconcile *Patterson* with the *Mullaney* notion that the prosecution must *always* carry the burden of persuasion as to all offense elements.").

**6.** [T]he Maine murder statute, Me. Rev. Stat. Ann., Tit. 17, § 2651 (1964), provides:
'Whoever unlawfully kills a human being with malice aforethought, either express or implied, is guilty of murder and shall be punished by imprisonment for life.'
The manslaughter statute, Me. Rev. Stat. Ann., Tit. 17, § 2551 (1964), in relevant part provides:

'Whoever unlawfully kills a human being in the heat of passion, on sudden provocation, without express or implied malice aforethought ... shall be punished by a fine of not more than $1,000 or by imprisonment for not more than 20 years ....'
*Mullaney*, 421 U.S. at 686 n.3, 95 S.Ct. at 1883 n.3.

**7.** "A person is guilty of murder in the second degree when:

"1. With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution under this subdivision, it is an affirmative defense that:

"extreme emotional disturbance" was an affirmative defense, and the Court held that "nothing was presumed or implied against Patterson," *Id.* at 216, 97 S.Ct. at 2330, so requiring him to prove his affirmative defense by a preponderance of the evidence did not deprive him of due process of law. *Id.* at 205, 97 S.Ct. at 2324. The *Patterson* court distinguished *Mullaney*, saying the instructions there "emphasized that 'malice aforethought and heat of passion on sudden provocation are two inconsistent things'; thus, by proving the latter the defendant would negate the former." *Id.* at 213, 97 S.Ct. at 2328. The distinction was further explained in *Smith v. United States*, 568 U.S. 106, 110, 133 S.Ct. 714, 719, 184 L.Ed.2d 570 (2013), where the Court said:

> The State is foreclosed from shifting the burden of proof to the defendant only "when an affirmative defense *does* negate an element of the crime." *Martin v. Ohio*, 480 U.S. 228, 237, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987) (Powell, J., dissenting). Where instead it "excuse[s] conduct that would otherwise be punishable," but "does not controvert any of the elements of the offense itself," the Government has no constitutional duty to overcome the defense beyond a reasonable doubt. *Dixon v. United States*, 548 U.S. 1, 6, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006).

Under Wyoming law, as the State concedes, "when a jury finds a sudden heat of passion a finding of malice is precluded ...." Thus, sudden heat of passion does controvert the malice element of murder.

▋ [¶29] We do not share the State's concern with the *Shull* requirement to inform the jury that the State has the burden of showing the absence of a sudden heat of passion, once the defendant has made the necessary showing. "Voluntarily, upon a sudden heat of passion," will continue to be an element of the crime of voluntary manslaughter that the State must prove beyond a reasonable doubt in order to convict the defendant of voluntary manslaughter. Stepped verdict forms can still be provided to juries. And rather than assume the jury understands that malice and sudden heat of passion are mutually exclusive, and that it is the State's burden to prove malice and disprove sudden heat of passion beyond a reasonable doubt, the jury should be expressly instructed to that effect.

[¶30] The State seizes upon our recognition in *Shull* that, while sudden heat of passion will typically be "a mitigator and not an element when a defendant is charged with murder," 2017 WY 14, ¶31, 388 P.3d at 770, on the rare occasions that a defendant is charged only with voluntary manslaughter and not murder, "sudden heat of passion is an element rather than a mitigating factor." *Id.* at ¶28 n.8, 388 P.3d at 769 n.8. It argues that we have infringed on the legislative power to determine what acts constitute crimes, and created a crime that is void for vagueness and will give prosecutors too much, or not enough, discretion, in making their charging decisions. But rather than venture into the thicket of branding sudden heat of passion as a mitigator, a partial justification or partial excuse, *see* Mitchell N. Berman & Ian P. Farrell, *Provocation Manslaughter as Partial Justification and Partial Excuse*, 52 Wm. & Mary L. Rev. 1027, 1031 (2011) ("While the precise nature of the distinction is disputed, justification defenses

---

"(a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

Section 125.20(2), N.Y. Penal Law § 125.20(2), (McKinney 1975), provides:

"A person is guilty of manslaughter in the first degree when:

"2. With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as defined in paragraph (a) of subdivision one of section 125.25. The fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subdivision."

*Patterson*, 432 U.S. at 198-99 nn.2 & 3, 97 S.Ct. at 2321 nn.2 & 3.

are generally said to apply when the actor's conduct is not wrongful, whereas excuse defenses are said to apply when the actor engages in wrongful conduct but is not liable, particularly because the actor is not blameworthy."), we suggest that there is very little difference between the State's position and this Court's analysis in *Shull*. The State concedes that "when a jury finds sudden heat of passion a finding of malice is precluded," and at oral argument it recognized that it was capable of fashioning a workable series of jury instructions which would include in the murder instructions definitions of "malice" and "maliciously" which explain that a finding of sudden heat of passion negates malice.

■ [¶31] We do, however, take heed of the State's argument regarding our conclusion in *Shull* that these instructional errors constituted structural error. 2017 WY 14, ¶ 51, 388 P.3d at 775. Sudden heat of passion was an integral part of Mr. Shull's theory of defense, *Id.* at ¶ 19, 388 P.3d at 767, and we held that the instructions given deprived him of adequately presenting that theory. Further, the instructions did not inform the jury of the State's burden to disprove sudden heat of passion. *Id.* at ¶ 34, 388 P.3d at 771. We compared the error to the error in *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), where the Supreme Court found that the failure to instruct the jury that the government had the burden to prove each element of the charged crime beyond a reasonable doubt was a structural error because it "vitiates *all* the jury's findings." *Shull*, ¶ 43, 388 P.3d at 773, (quoting *Sullivan*, 508 U.S. at 281, 113 S.Ct. at 2082). Upon further careful reflection, and considering the context of the cases raising this issue since *Shull*, we find that the instructional errors discussed above are less like those in *Sullivan*, and more like the instructional errors at issue in *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). There,

the United States Supreme Court ruled that an error in failing to instruct the jury on an essential element of an offense is not part of the limited class of fundamental constitutional errors "so intrinsically harmful as to require automatic reversal (i.e.

affect substantial rights) without regard to their effect on the outcome."

*Granzer v. State*, 2008 WY 118, ¶ 15, 193 P.3d 266, 271 (Wyo. 2008) (quoting *Neder*, 527 U.S. at 7, 119 S.Ct. at 1833). In *Granzer*, we reviewed our precedent on the distinction between trial error and structural (or "fundamental") error, and concluded "that a trial court's failure to instruct on an element of a crime is not a structural or fundamental error, but rather a trial error." *Id.* at ¶ 18, 193 P.3d at 271-72. Although we are very cognizant of the importance of stare decisis, we agree with Justice Anthony Kennedy, who said that "[t]o re-examine your premise is not a sign of weakness of your judicial philosophy. It's a sign of fidelity to your judicial oath." Sergio J. Campos, *Changing Course*, 65 U. Kan. L. Rev. 1025 (2017) (citing Mark Sherman, *Justice: Changing Course on the Bench Is Not Weakness*, AP NEWS (Sept. 23, 2016), https://apnews.com/93476b06b78c409393f38df4d5d507b7 (last visited Mar. 17, 2017)). We overrule our application of the structural error standard to the incorrect sudden heat of passion instructions in *Shull*, and return to the standard of review of instructional error enunciated in *Granzer*.

■ [¶32] Where, as here, the defendant has not lodged an appropriate trial objection, we will apply the plain error standard of review. *Collins v. State*, 2015 WY 92, ¶ 10, 354 P.3d 55, 57 (Wyo. 2015). "Plain error exists when: 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." *Id.* To show material prejudice, an appellant "must demonstrate a reasonable possibility that the jury verdict would have been more favorable in the absence of the error." *Tingey v. State*, 2017 WY 5, ¶ 27, 387 P.3d 1170, 1178 (Wyo. 2017) (quoting *Vaught v. State*, 2016 WY 7, ¶ 14, 366 P.3d 512, 516 (Wyo. 2016)).

■ [¶33] The district court's instructions applicable to first-degree and second-degree murder did not inform the jury of the State's burden to prove the absence of a sudden heat of passion to convict Mr. Schmuck of those crimes, and thus the record clearly shows the

alleged error. The query of the second prong—whether the instructions violate a clear and unequivocal rule of law—is not as easily answered. On one hand, the instructions violate *Shull's* unequivocal rule of law that, when a defendant presents some evidence that he acted in a sudden heat of passion, the State has the burden to prove its absence. 2017 WY 14, ¶ 34, 388 P.3d at 771. At a minimum, the evidence indicated that passion played a role in Mr. Schmuck's actions and, under *Shull*, the State had the burden to prove that he did not act with a sudden heat of passion.

[¶34] However, *Shull* was not a clear and unequivocal rule of law at the time of Mr. Schmuck's trial, as it was not published until nearly fifteen months after his conviction. In *Miller v. State*, we noted that "[w]e have never addressed the issue of whether an alleged error in jury instructions is evaluated at the time of trial or while the appeal is pending." 2015 WY 68, ¶ 7, 350 P.3d 264, 266 (Wyo. 2015).[8] In that case, the trial court gave the jury an instruction defining the term "malice" in accordance with then-settled Wyoming law. *Id.* But our subsequent decision in *Wilkerson v. State*, 2014 WY 136, 336 P.3d 1188 (Wyo. 2014) changed the definition of "malice" for the purposes of murder and the definition provided to Miller's jury consequently violated the law in effect at the time of our review. *Miller*, ¶ 7, 350 P.3d at 266. Thus, we were asked to decide when a rule of law must be "clear and unequivocal" for the purposes of plain error review: at the time of trial or at the time of appellate review. *Id.* We found it unnecessary to decide the question, however, because the appellant could not show prejudice sufficient to meet the third prong of plain error review. *Id.* at ¶ 8, 350 P.3d at 266 ("Even assuming that the

alleged error should be evaluated at the time of appellate consideration and that Appellant can establish that Jury Instruction No. 14 violated a clear and unequivocal rule of law, Appellant has not demonstrated that he was prejudiced by the instruction."); *see also Johnson v. State*, 2015 WY 118, ¶ 21, 356 P.3d 767, 773 (Wyo. 2015) (declining to decide whether the violation of the newly-settled *Wilkerson* rule constitutes a "clearly established law" for the purposes of plain error review because, as in *Miller*, the appellant could not show material prejudice).

[¶35] Once more, as in *Miller* and *Johnson*, it remains unnecessary to decide when a rule of law must be "clear and unequivocal" under the second prong of plain error review. Mr. Schmuck suffered no prejudice from the instruction given and cannot satisfy the third prong. Although defense counsel initially proposed the jury instruction on voluntary manslaughter, it was never expressed as Mr. Schmuck's theory of defense. While Mr. Schmuck testified that had he been "mad," "upset," and "pissed off," he stated that he calmed down "quite a bit" as he drove to Mrs. Schmuck's house; that he stopped along the way and considered turning around and going home; and that he ultimately continued driving to the house so he could "talk to her" about "why she's doing the divorce this way instead of like we talked about."

[¶36] Defense counsel consistently asserted that Mr. Schmuck was not acting with a sudden heat of passion. In his opening statement, defense counsel explained to the jury that Mr. Schmuck had "cooled off" before arriving at the house. In the motion for judgment of acquittal, he stated that "the evidence has shown that when he went into the house, he had had time to cool." In

---

8. In a later case, *Vaught v. State*, we stated that "to establish that failure to give [a jury] instruction violated a clear rule of law, [an appellant] must provide authority showing that, **at the time of his trial**, Wyoming law had a clear-cut requirement that juries be given the instruction he now champions." 2016 WY 7, ¶ 14, 366 P.3d 512, 516 (Wyo. 2016) (citing *Causey v. State*, 2009 WY 111, ¶¶ 20-21, 215 P.3d 287, 293-94 (Wyo. 2009) (emphasis added). However, neither *Vaught* nor *Causey* called on us to determine *when* a rule of law must be "clear and unequivocal" to meet plain error review. *See Vaught*, ¶¶ 26, 30, 366

P.3d at 518, 519 (finding no violation of a "clearly established" rule of law where the purported rule of law is a "broad, vague, and general" concept found in the Model Penal Code but not in the Wyoming statute); *Causey*, ¶ 20, 215 P.3d at 294 (finding no violation of a clear rule of law where the purported rule of law "can be derived only through a meticulous examination of the subtle discussions contained in [several] cases"). Thus, *Vaught's* statement that an appellant must show that the rule of law was clear and unequivocal "at the time of trial" is merely dicta, and the issue remains undecided by this Court.

closing, he maintained that Mr. Schmuck had time to "cool down and think" during the twenty-mile drive to the house. Defense counsel alleged that parking the car down the street and cutting the telephone wires indicated that Mr. Schmuck had cooled down—because if he was really mad, he would have barged right in. Instead, he argued, Mr. Schmuck went to the house with the simple intent of having a conversation with Mrs. Schmuck and cut the phone lines so she would not call anyone and they could talk without interruption.

■ [¶37] According to defense counsel, when Mrs. Schmuck pointed a gun at Mr. Schmuck and pulled the trigger, he reacted instinctively—a "fight-or-flight" reaction—and pushed the gun out of the way and punched her with the hatchet in his hand.[9] Defense counsel asserted unequivocally that Mr. Schmuck did not act with a sudden heat of passion, stating that Mr. Schmuck's "fight-or-flight" reaction may have been sudden, but it was a "rational" response not driven by a "passion" such us "anger" or "hatred":

> Ladies and gentlemen, he had no business being out there. He was in violation of a protection order meant to protect her. He's pled guilty to it. He's serving jail time for it.
>
> He's guilty of pushing in that front door, of being in that house when he shouldn't have been. He's guilty of a lot of things.
>
> There could be a lot of other things he's guilty of, but he is not guilty of premeditated malice. He is not guilty of doing it maliciously, and *he's not guilty of doing it in a sudden heat of passion.*

(Emphasis added.) Because Mr. Schmuck argued that he did not act with a sudden heat of passion, he suffered no material prejudice from the district court's failure to require the

State to prove the absence of a sudden heat of passion. An instruction conforming to *Shull* would not change the outcome.[10] For this reason, we find no plain error.

**B. Did the district court err when it failed to instruct the jury that "malice" for purposes of first-degree murder means the defendant acted intentionally without legal justification or excuse and with hatred, ill will, or hostility?**

■ [¶38] Mr. Schmuck asserts that the district court erroneously instructed the jury as to the definition of "malice" for the purposes of first-degree murder because the definition did not comply with the definition of "malice" required by *Johnson v. State*, 2015 WY 118, 356 P.3d 767 (Wyo. 2015). Mr. Schmuck did not object to the instruction during trial, and so we apply the three-prong test for plain error. *Collins*, 2015 WY 92, ¶ 10, 354 P.3d at 57.

[¶39] The alleged violation clearly appears in the jury instructions, which defined "premeditated malice" as it pertains to first-degree murder. Instruction No. 14 stated: " 'Premeditated malice' means that the Defendant thought about and considered the idea of killing before the act which caused death was committed, and that the act which caused death was done with intent to kill and without legal justification or excuse."

[¶40] The district court's definition of "premeditated malice" did not comport with *Johnson v. State*, in which we considered the meaning of "malice" in the context of first-degree murder. 2015 WY 118, ¶¶ 14-24, 356 P.3d at 771-73. In *Johnson*, we announced that, for the purposes of first-degree murder, "juries must be instructed ... that "malice"

---

9. Defense counsel repeatedly used the phrase "fight-or-flight" in closing arguments, seemingly as code for self-defense—his purported theory of defense. For example, at one point defense counsel stated, "Did he act rationally? Well, yeah, I do say he acted rationally. You could also say he acted in *self-defense, flight-or-fight, whatever you want to call it,* without reflection or deliberation." (Emphasis added.)

10. "[A] defendant has the right to have instructions on his theory of the case or his theory of

defense presented to the jury if the instructions sufficiently inform the jury of the theory of defense and if competent evidence exists which supports the law expressed in the instructions." *Bruce v. State*, 2015 WY 46, ¶ 79, 346 P.3d 909, 932 (Wyo. 2015) (internal citation omitted). While there was sufficient evidence to support giving the sudden heat of passion instruction, it was clearly inconsistent with the theory of defense.

means the defendant acted intentionally without legal justification or excuse *and* with hatred, ill will or hostility." *Id.* at ¶ 19, 356 P.3d at 772 (emphasis in original). Here, Instruction No. 14 defines "premeditated malice" to include premedition ("[T]he Defendant thought about and considered the idea of killing before the act which caused death was committed."), intent to kill ("[T]he act which caused death was done with intent to kill."), and the absence of an affirmative defense ("without legal justification or excuse"). However, the instruction does not require a finding of hatred, ill will, or hostility. By allowing the jury to convict Mr. Schmuck of first-degree murder without finding that he acted with hatred, ill will, or hostility, the instruction violates the clear and unequivocal rule of law set out in *Johnson*.

[¶41] Mr. Schmuck, however, cannot show material prejudice. While Instruction No. 14 erroneously lowered the State's burden to prove first-degree murder, the jury acquitted Mr. Schmuck of that charge. There is no outcome more favorable than acquittal, and so the error caused no prejudice.

[¶42] Mr. Schmuck contends that, by lowering the standard for finding malice in the context of first-degree murder, the district court indirectly lowered the standard for finding malice in the context of second-degree murder in the jurors' minds. Therefore, he argues, he was prejudiced by his conviction of attempted second-degree murder. We assume, however, that juries follow the trial court's instructions. *Earley v. State*, 2011 WY 164, ¶ 11, 267 P.3d 561, 564 (Wyo. 2011) (citations omitted). And, we consider jury instructions in the context of all instructions given. *Drennen v. State*, 2013 WY 118, ¶ 20, 311 P.3d 116, 124 (Wyo. 2013). Here, Instruction No. 14 specifically restricts its definition of "Premeditated malice" to "[a]s used in Instruction No. 13," which lists the elements of first-degree murder. Further, Instruction No. 18 provides a different definition of "malice" for the purposes of second-degree murder. *See supra* ¶ 19. Taken as a whole, the instructions leave no room for confusion as to which charge the definition of premeditated malice applies, and Mr.

Schmuck's allegation of secondhand harm falls well short of establishing the "reasonable possibility" of a more favorable verdict. *Tingey*, 2017 WY 5, ¶ 27, 387 P.3d at 1178. Thus, the misstatement of law in Instruction No. 14 did not constitute plain error.

**C. Did the district court err when it, for the purposes of second-degree murder, provided the jury with a definition of both "malice" and "maliciously", and failed to define "recklessly" or "recklessly under circumstances manifesting an extreme indifference to the value of human life"?**

[¶43] Wyoming's second-degree murder statute requires the State to prove that the defendant killed a human being "purposely" and "maliciously." Wyo. Stat. Ann. § 6-2-104 (LexisNexis 2017). Accordingly, the district court instructed the jury on those elements:

INSTRUCTION NO. 17

The pertinent elements of Second Degree Murder are:

. . . . . . . . .

3. a person,

4. Purposely and,

5. Maliciously,

6. Killed a human being.

[¶44] Mr. Schmuck's contentions center on the element of "maliciously." His alleged errors appear in the following instruction:

INSTRUCTION NO. 18

As used in Instruction No. 17 the term "malice" means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, and that the act was done without legal justification or excuse.

The term "maliciously" means that the act constituting the offense was done intentionally but without premeditation, was reasonably likely to result in death and was done recklessly under circumstances manifesting an extreme indifference to the value of human life, and was done without legal justification or excuse.

The instruction was modeled after the current pattern instruction, W.Cr.P.J.I. 21.01D2,

which incorporates our recent holding in *Wilkerson*: "the jury must be instructed that "malice" means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, *and* that the act was done without legal justification or excuse." 2014 WY 136, ¶ 27, 336 P.3d at 1200 (emphasis in original).

### 1. "Malice" and "Maliciously"

[¶45] Mr. Schmuck first contends that the district court erred by defining both "malice" and "maliciously" for the jury. Because the district court overruled Mr. Schmuck's objection at trial and denied his motion for a new trial, which realleged the error, we review for abuse of discretion. *Hurley v. State*, 2017 WY 95, ¶ 8, 401 P.3d 827, 829-30 (Wyo. 2017) (citation omitted) (we review a decision on jury instructions for abuse of discretion); *Sam v. State*, 2017 WY 98, ¶ 28, 401 P.3d 834, 847 (Wyo. 2017), *reh'g denied* (Sept. 26, 2017) (we generally review a decision on a motion for a new trial for abuse of discretion). When reviewing for abuse of discretion, we recognize:

> District courts have wide latitude in instructing the jury and, as long as the instructions correctly state the law and the entire charge covers the relevant issue, reversible error will not be found. An incorrect ruling on an instruction must be prejudicial to constitute reversible error. Because the purpose of jury instructions is to provide guidance on the applicable law, prejudice will result when the instructions confuse or mislead the jury.

*Hurley*, ¶ 8, 401 P.3d at 830 (citations and quotation marks omitted).

[¶46] Mr. Schmuck contends that, despite our holding in *Wilkerson*, the district court should have not defined "malice" because the element instruction for second-degree murder, to which the definitional instruction referred, used the term "maliciously." Mr. Schmuck argues that providing this definition of "malice" in the context of second-degree murder may have confused the jury because we define "malice" differently for first-degree murder. Compare *Wilkerson*, 2014 WY 136, ¶ 27, 336 P.3d at 1200 with *Johnson*, 2015 WY 118, ¶ 14, 356 P.3d at 771.

[¶47] We agree that the Wyoming second-degree murder statute uses the term "maliciously"—not "malice." Wyo. Stat. Ann. § 6-2-104. Although "malice" is simply the substantive form of the adverb, "maliciously," it is preferable to define a term in the same form that it is used in the instruction and the statute. The district court did not abuse its discretion, however, when it instructed the jury on the definitions of both "malice" and "maliciously." Its definition of "malice" correctly stated the law under *Wilkerson*. 2014 WY 136, ¶ 27, 336 P.3d at 1200. While the district court incorrectly used the term "malice"—a different form of "maliciously"—we cannot say that substituting a noun for the adverb form of the same root word is prejudicially confusing or misleading with these facts. Either form will convey the same underlying meaning. Because we assume that juries follow the trial court's instructions, *Earley*, 2011 WY 164, ¶ 11, 267 P.3d at 564, we note that Instruction No. 18 defined "malice" as used in the element instruction for second-degree murder. Thus, contrary to Mr. Schmuck's assertion, the instruction did not allow the jury to confuse its definition of "malice" with the definition of "premeditated malice" for the purposes of first-degree murder.

### 2. "Recklessly" and "recklessly under circumstances manifesting an extreme indifference to the value of human life"

[¶48] Mr. Schmuck next alleges that the district court erroneously failed to include in the instruction of "malice" and "maliciously" a definition of "recklessly" or "recklessly under circumstances manifesting an extreme indifference to the value of human life." Because Mr. Schmuck did not make this objection at trial, we apply the plain error analysis. *Collins*, 2015 WY 92, ¶ 10, 354 P.3d at 57.

[¶49] Mr. Schmuck argues that the district court should have provided the jury the statutory definition of the term "recklessly" provided by Wyo. Stat. Ann. § 6-1-104(a)(ix) (LexisNexis 2017):

(a) As used in this act, unless otherwise defined:

. . . .

(ix) "Recklessly" is defined as the following conduct: A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]

Mr. Schmuck claims that omitting this statutory definition was erroneous because *Wilkerson* adopted the language "recklessly under circumstances manifesting an extreme indifference to the value of human life" from *O'Brien v. State*, and, in *O'Brien*, we directed the trial court in an aggravated assault and battery case to instruct the jury as to the statutory definition of "recklessly" in conjunction with the requirement of extreme indifference. 2002 WY 63, ¶ 21, 45 P.3d 225, 232 (Wyo. 2002). Therefore, Mr. Schmuck maintains that our holding in *Wilkerson* did not incorporate the entire analysis of extreme recklessness under *O'Brien*. Without the statutory definition, Mr. Schmuck contends that the jury applied an ordinary meaning of "recklessly," which has a lower level of culpability than that provided by Wyo. Stat. Ann. § 6-1-104. Alternatively, Mr. Schmuck argues that the district court should have provided the jury with a definition of the phrase "recklessly under circumstances manifesting an extreme indifference to the value of human life" in order to explain its heightened standard of recklessness. The State responds that, because *Wilkerson* did not hold that a jury instruction on "malice" must include a definition of either "recklessly" or "recklessly under circumstances manifesting an extreme indifference to the value of human life," the district court's instruction

did not violate a clear and unequivocal rule of law.

[¶50] A recap of *O'Brien* and *Wilkerson* helps make sense of Mr. Schmuck's claim of error. In *Wilkerson*, we borrowed from *O'Brien*—an aggravated assault and battery case—the language "recklessly under circumstances manifesting an extreme indifference to the value of human life" to define the malicious intent that differentiates second-degree murder from manslaughter. 2014 WY 136, ¶ 27, 336 P.3d at 1200. We did not likewise adopt from *O'Brien* the statutory definition of "recklessly." *See id.* While "recklessly" appears in the Wyoming assault and battery statute, Wyo. Stat. Ann. § 6-2-502, it does not appear in the second-degree murder statute, Wyo. Stat. Ann. § 6-2-104. We determined that the borrowed language adequately described the state of mind necessary to classify a homicide as second-degree murder and no further instruction was necessary. *Wilkerson*, ¶ 27, 336 P.3d at 1200.

[¶51] In *O'Brien*, consistent with the statute, the trial court instructed the jury that, to convict the defendant of aggravated assault and battery, the jury must find that he caused serious bodily injury to the victim "[i]ntentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 2002 WY 63, ¶ 9, 45 P.3d at 229; Wyo. Stat. Ann. § 6-2-502(a)(i) (LexisNexis 2017). The trial court separately provided to the jury a definition of "recklessly."[11] *O'Brien*, ¶ 9, 45 P.3d at 229. On appeal of his conviction, the defendant claimed that the trial court should not have defined "recklessly" for the jury but, instead, it should have defined the phrase "recklessly under circumstances manifesting extreme indifference to the value of human life" because it conveyed a higher degree of recklessness. *Id.* at ¶ 7, 45 P.3d at 228.

---

11. The trial court gave the following definition of "recklessly," which tracks, in part, the definition at Wyo. Stat. Ann. § 6-1-104(a)(ix) (similar language italicized):

Recklessly is different from knowingly or intentionally. Recklessness does not require proof of an intent or purpose to do harm. It is, instead, an utter unconcern about the consequences of one's acts. Recklessness is rash and careless conduct. *A person is reckless when he consciously disregards a substantial and unjustified risk that his acts will cause serious harm. The risk must be of such a nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe under the circumstances.*

*O'Brien*, ¶ 9, 45 P.3d at 229 (emphasis added).

[¶52] We recognized in *O'Brien* that, when revising our assault and battery statutes in 1982, the legislature borrowed the phrase "recklessly under circumstances manifesting extreme indifference to the value of human life" from the Model Penal Code, and that the Code differentiated this heightened form of recklessness from ordinary recklessness. 2002 WY 63, ¶¶ 14-16, 45 P.3d at 230-31. The Code defined "recklessly" similarly to the Wyoming statutory definition:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

Model Penal Code § 2.02(2)(c), at 226 (Am. Law Inst. 1985). The Code described such recklessness as "ordinary recklessness." Model Penal Code § 210.2 cmt. 4, at 21 (Am. Law Inst. 1980). On the other hand, we noted that the Code defined "recklessly under circumstances manifesting extreme indifference to the value of human life" as a recklessness of a "special character"—borrowed from the Code's definition of murder—that elevated an assault or battery to an aggravated assault or battery. *O'Brien*, ¶ 16, 45 P.3d at 231. Thus, under Wyoming law, the distinction between the two forms of recklessness drew the line between the misdemeanor of battery (requiring a jury to find that the defendant, at a minimum, acted "recklessly") and the felony of aggravated assault and battery (requiring a finding that the defendant, at a minimum, acted "recklessly under circumstances manifesting extreme indifference to the value of human life").[12] *Id.* at ¶ 17, 45 P.3d at 232.

[¶53] Because it would not support a conviction of aggravated assault and battery, we found it improper to provide the jury with a definition of ordinary recklessness without "further proper instruction." *O'Brien*, 2002 WY 63, ¶¶ 17-18, 45 P.3d at 232. Thus, in an aggravated assault and battery trial, we set forth a two-step instruction: first, the trial court must provide the statutory definition of ordinary recklessness under Wyo. Stat. Ann. § 6-1-104(a)(ix); and second, "if the jury determines the defendant acted recklessly, the jury must then determine whether that recklessness rose to the level of 'extreme indifference to the value of human life.'" *Id.* at ¶ 21, 45 P.3d at 232.

[¶54] In *Wilkerson*, we adopted the phrase "recklessly under circumstances manifesting an extreme indifference to the value of human life" to define "malice" in the context of second-degree murder. 2014 WY 136, ¶ 27, 336 P.3d at 1200. There, for the purposes of the second-degree murder charge, the trial court provided the jury the following definitions of "malice" and "maliciously":

The term malice means that the act(s) constituting the offense charged was/were done intentionally, without legal justification or excuse or that the act(s) was/were done in such a manner as to indicate hatred, ill will, or hostility towards another.

"Maliciously" means acting in the state of mind in which an intentional act is done without legal justification or excuse. The term "maliciously" conveys the meaning of hatred, ill will, or hostility toward another.

*Id.* at ¶ 7, 336 P.3d at 1190. The jury convicted the defendant of second-degree murder and, on appeal, the defendant challenged this instruction. *Id.* at ¶¶ 1, 7, 336 P.3d at 1189, 1190.

[¶55] We agreed that the instruction created a very low threshold of proof for conviction. *Wilkerson*, 2014 WY 136, ¶ 8, 336 P.3d at 1191. Because the definitions "would encompass nearly every form of criminal homicide," we recognized that malice in the context of second-degree murder must "require something more than mere 'hatred, ill will, or

---

**12.** "A person is guilty of battery if he intentionally, knowingly or recklessly causes bodily injury to another person by use of physical force." Wyo. Stat. Ann. § 6-2-501(b) (LexisNexis 2017). A person is guilty of aggravated assault and battery if he "[c]auses or attempts to cause serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." Wyo. Stat. Ann. § 6-2-502(a)(i).

hostility' or the mere absence of 'legal justification or excuse.'" *Id.* at ¶ 26, 336 P.3d at 1200. Thus, after an extensive discussion of the history of law related to second-degree murder in Wyoming, we concluded that the *O'Brien* formulation of heightened recklessness—that which manifests an extreme indifference to the value of human life—accurately defined malice in the context of second-degree murder.[13] *See Wilkerson*, ¶¶ 20-24, 336 P.3d at 1196-99. We described our reasoning as follows:

[W]e find that our analysis in *O'Brien*, relating to the difference between Wyoming's simple and aggravated assault and battery statutes, leads to a similar conclusion with respect to the distinction between Wyoming's manslaughter and second-degree murder statutes. Under Wyo. Stat. Ann. § 6-2-105, manslaughter, which is a lesser-included offense of second-degree murder, requires a showing that the defendant acted "recklessly." In order to distinguish between manslaughter and second-degree murder, the Wyoming Legislature must have intended to require a more culpable mental state than ordinary recklessness to justify a second-degree murder conviction.

*Id.* at ¶ 24, 336 P.3d at 1199. Accordingly, we held that, on remand, "the jury must be instructed that 'malice' means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, and that the act was done without legal justification or excuse." *Id.* at ¶ 27, 336 P.3d at 1200 (emphasis omitted).

[¶56] The State alleges that, under our holding in *Wilkerson*, if a jury finds that a defendant acted purposely, it has necessarily found that the defendant acted with an extreme indifference and, therefore, acted maliciously. To advance its argument, the State seizes upon two selected quotations from *Wilkerson*: extreme recklessness "cannot be fairly distinguished in grading terms from homicides committed purposely or knowingly"; and a "purposeful or knowing homicide demonstrates precisely such indifference to the value of human life." *Id.* at ¶ 21, 336 P.3d at 1197 (quoting *O'Brien*, ¶ 16, 45 P.3d at 231, quoting Model Penal Code § 210.2(1)(b) cmt. 4, at 21-22).

[¶57] "We will not construe statutes in a manner which renders any portion meaningless or produces absurd results." *TPJ v. State*, 2003 WY 49, ¶ 11, 66 P.3d 710, 713 (Wyo. 2003) (citation omitted). If we were to accept the State's interpretation of *Wilkerson*, the "maliciously" element would have no function, as it would be subsumed by the "purposely" element. The statements from *Wilkerson* offered by the State seemingly merge the elements of "purposely" and "maliciously" only because they are isolated outside their intended context. The quotations originate in the Commentary to the Model Penal Code and were relayed by *O'Brien* and *Wilkerson* in a background discussion of the Code's basis for including homicides committed with extreme recklessness in the general category of murder. *See Wilkerson*, 2014 WY 136, ¶ 21, 336 P.3d at 1197; *O'Brien*, 2002 WY 63, ¶ 16, 45 P.3d at 231; Model Penal Code, *supra*, § 210.2(1)(b) cmt. 4, at 21-22. Importantly, in *Wilkerson*, we borrowed the language of the Code to define only the element of malicious intent. *Wilkerson*, ¶ 27, 336 P.3d at 1200. We adopted neither its definition of a purposeful homicide [14] nor its grades of

---

**13.** We also found support in *Lopez v. State*, 2004 WY 28, 86 P.3d 851 (Wyo. 2004) for the general proposition that malice in the context of second-degree murder required a showing of depraved indifference to the value of human life. *Wilkerson*, ¶ 15, 336 P.3d at 1193, discussing *Lopez*, ¶¶ 21-23, 86 P.3d at 858-59. Additionally, we examined precedent from Utah and Colorado that mirrored this approach. *Wilkerson*, ¶ 18, 336 P.3d at 1195, citing *State v. Wardle*, 564 P.2d 764, 765 n.1 (Utah 1977) (equating "implied malice" with a mental state exhibiting "a depraved indifference to human life"); *Wilkerson*, ¶ 19, 336 P.3d at 1195-96, discussing *People v. Jefferson*,

748 P.2d 1223, 1226-27 (Colo. 1988) (stating, among other things, that malice requires an extreme form of recklessness).

**14.** The Code states that if the material element of an offense "involves the nature of his conduct *or* a result thereof," a person acts "purposely" with respect to that element when "it is his conscious object to engage in the conduct of that nature *or* to cause such a result." Model Penal Code, *supra*, § 2.02(2)(a)(i), at 225 (emphasis added). Criminal homicide is committed when a person *causes* the death of another human being. Model Penal Code, *supra*, § 210.1, at 4. The material element

criminal homicide.[15] *See id.* By failing to make this distinction, the State conflates a purposeful homicide under the Code with a purposeful second-degree murder under Wyoming law.

[¶58] We confirmed in *Wilkerson* that the element of "purposely" in second-degree murder is "a general intent element that 'describes the act to be committed and not an intention to produce a desired, specific result.'" *Id.* at ¶ 13, 336 P.3d at 1192 (quoting *Crozier v. State*, 723 P.2d 42, 54 (Wyo. 1986), *overruled on other grounds by Wilkerson*, 2014 WY 136, 336 P.3d 1188). To satisfy the element of "purposely," the State must prove that the defendant "*acted* purposely, not that he *killed* purposely." *Id.* at ¶ 14, 336 P.3d at 1192 (quoting *Butcher v. State*, 2005 WY 146, ¶ 20, 123 P.3d 543, 550 (Wyo. 2005), *overruled on other grounds by Wilkerson*, 2014 WY 136, 336 P.3d 1188 (emphasis in original)). A purposeful second-degree murder in Wyoming does not necessarily demonstrate extreme indifference, as it demonstrates merely the intent to act. *Wilkerson*, ¶ 14, 336 P.3d at 1192. When a Wyoming jury finds that the defendant acted "purposely" in the context of second-degree murder, it has not yet considered, let alone satisfied, the element of "maliciously."

[¶59] We reiterate our holding in *Wilkerson*: "in order to demonstrate malicious intent [for second-degree murder], the State must show a heightened form of recklessness as compared to that required for manslaughter; i.e., the State must show that the defendant acted recklessly under circumstances manifesting an extreme indifference to the value of human life." 2014 WY 136, ¶ 27, 336 P.3d at 1200; *see also Johnson*, 2015 WY 118, ¶ 18, 356 P.3d at 772 (explaining that our definition of "malice" provided in *Wilkerson* does not apply to first-degree murder). We declined to adopt from *O'Brien* the preliminary step of providing the jury the definition of ordinary recklessness at Wyo. Stat. Ann. § 6-1-104(a)(ix). We stated that "this formulation [of extreme indifference to the value of human life] adequately distinguishes second-degree murder from manslaughter." *Wilkerson*, ¶ 27, 336 P.3d at 1200; *see also O'Brien*, 2002 WY 63, ¶ 21, 45 P.3d at 232 (citing Model Penal Code § 210.2 cmt. 4, at 25 ("[T]he point involved is put adequately and succinctly by asking whether the recklessness rises to the level of 'extreme indifference to the value of human life' ... [and] it seems undesirable to suggest a more specific formulation.")).

[¶60] Mr. Schmuck argues that the district court plainly erred by failing to define "recklessly" or "recklessly under circumstances manifesting an extreme indifference to the value of human life." This alleged error, appearing in Instruction No. 18, does not transgress a clear and unequivocal rule of law. The district court provided to the jury the definition of malice prescribed by our holding in *Wilkerson*. 2014 WY 136, ¶ 27, 336 P.3d at 1200. We did not require a trial court to define "recklessly" to the jury and stated that our formulation of heightened recklessness adequately distinguishes second-degree murder from manslaughter. *See id.* Therefore, the district court's omission of a definition of "recklessly" or "recklessly under circumstances manifesting an extreme indifference to the value of human life" was not plainly erroneous.

**D. Did the district court err when it used the term "provokes" to instruct the jury on an aggressor's right of self-defense?**

[¶61] Mr. Schmuck argues that "provokes" has a special meaning in the law of self-defense and that the district court erred

---

of criminal homicide—causing the death of another human being—involves the *result* of a person's conduct. Accordingly, to "purposely" commit criminal homicide, it must be the person's conscious object to cause the death of another human being. Therefore, a purposeful homicide under the Code demonstrates indifference to the value of human life because it requires a specific intent to kill.

15. The Code does not differentiate between degrees of murder. Model Penal Code, *supra*, § 210.2 cmt. 3, at 20. Because the Wyoming Legislature has distinguished degrees of murder, it would be incorrect to apply the Code's "grading terms" to a discussion of Wyoming law. Wyo. Stat. Ann. § 6-2-101 (murder in the first degree); Wyo. Stat. Ann. § 6-2-104 (murder in the second degree).

by using this special term to instruct the jury as to an aggressor's right of self-defense in Instruction No. 26. The instruction reads as follows:

### INSTRUCTION NO. 26

Generally, the right to use self-defense is not available to *an aggressor who provokes the conflict*. However, *if one provokes a conflict* but thereafter withdraws in good faith and informs the adversary by words or actions of the desire to end the conflict and is thereafter pursued, that person then has the same right of self-defense as any other person. The person is justified in using force to the same extent that any other person would be who was acting in self-defense.

In order to be considered an aggressor, at least in the context of attempted homicide, "some sort of physical aggression or a threat of imminent use of deadly force is required before a person will be considered an aggressor."

(Emphasis added.)

[¶62] Mr. Schmuck did not object to the instruction at trial. Rather, he requested that the district court define "provokes" and encouraged the court look to Black's Law Dictionary for such a definition. The district court, however, declined his request. Although defense counsel did not provide the district court his proposed definition at that time, Mr. Schmuck offers the following definition of "provoking a difficulty" from the 1968 edition of Black's Law Dictionary:

PROVOKING A DIFFICULTY. The law on this point arises only where deceased was the attacking party, and his attack was brought about by the words or acts of accused, intended to bring on the attack, in order that advantage might be taken thereof by him to slay his adversary and escape the consequences.

Black's Law Dictionary 1390 (4th ed. 1968). Mr. Schmuck concedes that subsequent editions of Black's Law Dictionary no longer define the term. The significance of the 1968 definition of "provoking the difficulty" is that it includes the ingredient of intent: that is, if applied to Instruction No. 26, an "aggressor who provokes the conflict" would be an aggressor who intentionally contrived an alter-

cation as a pretext for killing his adversary under the cover of self-defense.

[¶63] Mr. Schmuck offers two Wyoming cases to support his position. In *Ross v. State*, 8 Wyo. 351, 57 P. 924 (1899), the defendant intentionally baited the victim into attacking him for the sole purpose of killing the victim under the pretense of self-defense. The defendant armed himself, walked into a saloon, interfered in a card game, slapped the deceased in the face and pulled on his ear; then, shortly thereafter outside the saloon, the defendant insulted the deceased, causing the deceased to draw his pistol and fire, at which time the defendant shot and killed him. *Id.* at 930-31. We found that the "evidence tended to show that defendant sought a quarrel with the deceased, and, as he did kill him, that he sought it with the purpose of killing him," and thus his actions constituted murder rather than self-defense. *Id.* at 931. Mr. Schmuck also directs this Court to *State v. Flory*, 40 Wyo. 184, 276 P. 458 (1929), in which the defendant armed himself and went to the home of the deceased, aimed his rifle at him, and accused him of raping the defendant's wife. *Id.* at 460. The deceased "sprang" at the defendant and the defendant shot him dead. *Id.* In *Flory*, we found that the defendant had "produced the occasion through his fault" and, therefore, had no right of self-defense without first retreating. *Id.* at 463.

[¶64] Despite having asked the district court to define "provokes" for the jury, Mr. Schmuck acknowledges on appeal that it would have been inappropriate for the district court to grant his request. As the record makes apparent, there are no facts showing that Mr. Schmuck had preplanned his encounter with Mrs. Schmuck for the purpose of attacking her in "self-defense." Thus, the district court properly refused Mr. Schmuck's proposed definition of "provokes." See *Drennen*, 2013 WY 118, ¶ 20, 311 P.3d at 124 (stating that instructions are properly refused if, among other things, they are confusing or not based on evidence).

[¶65] On appeal, however, Mr. Schmuck now contends that, because the concept of "provoking the conflict" was not applicable to

the facts, the term "provokes" should have been excised from the instruction altogether. Because Mr. Schmuck did not object at trial to the use of the term "provokes" in the instruction, we once again review for plain error.

[¶66] The alleged error clearly appears in Instruction No. 26. The error, however, violates no clear and unequivocal rule of law. In *Causey v. State*, we reviewed for plain error the trial court's decision to not provide to the jury a similar definition of "provokes the conflict" as used in a nearly-identical jury instruction. 2009 WY 111, ¶ 18, 215 P.3d 287, 293 (Wyo. 2009). Although Mr. Schmuck has reframed the alleged error here as a failure to remove, rather than define, the term, he continues to ground his argument in the proposition that "provokes" is a legally-defined term, as did the appellant in *Causey*. *Id.* at ¶ 14, 215 P.3d at 292. In *Causey*, we found that a specialized legal definition of "provokes the conflict" was not "clear and unequivocal" because it was "derived only through a meticulous examination of the subtle discussions" contained in "self-defense cases dating back eighty years." *Id.* at ¶ 20, 215 P.3d at 294. Mr. Schmuck's sole addition to the case law previously examined in *Causey* is a legal definition unearthed from a legal dictionary nearly fifty years obsolete. We are not convinced that the 1968 definition of "provokes the conflict"—which has not since been republished—transforms "subtle discussions" in our jurisprudence into an explicit rule of law. Furthermore, as used in the instruction, "provoke" does not imply intentional incitement as Mr. Schmuck alleges. The contemporary, colloquial meaning of "provokes" effectively and properly conveys to the jury the need to find a causal connection between the aggressor's actions and the circumstances that gave rise to the altercation. For these reasons, the instruction was not erroneous.

**E. Did the district court err when it instructed the jury that Mr. Schmuck had an absolute duty to retreat before using deadly force?**

[¶67] Mr. Schmuck argues that the district court improperly instructed the jury

that he had an absolute duty to retreat before asserting the right of self-defense. Mr. Schmuck did not object to the instruction and, again, we apply plain error review. *Collins*, 2015 WY 92, ¶ 10, 354 P.3d at 57.

[¶68] The alleged error appears in Instruction No. 27. When we review a jury instruction for error, however, we view it in context of all instructions given. *Drennen*, 2013 WY 118, ¶ 20, 311 P.3d at 124. Here, the district court instructed the jury on self-defense as follows:

INSTRUCTION NO. 24

As a general proposition, the law recognizes that a person has a right of self-defense. If a person has reasonable grounds to believe and [actually] does believe that he or she is in imminent danger of death or serious bodily harm from which he or she save themselves only by using deadly force against an assailant, the person had the right to use deadly force in self-defense in order to defend himself. "Deadly force" means force which is likely to cause death or serious bodily harm.

The circumstances under which the person acted must have been such as to produce in the mind of a reasonably prudent person, similarly situated, the reasonable belief that the assailant was about to kill the [sic] him or do serious bodily harm to the [sic] him. The danger must be apparent, present and imminent or must have appeared to be so under the circumstances.

If a person believes that he is in imminent danger of death or serious bodily harm, and that deadly force was necessary to repel such danger, and if a reasonable person in a similar situation seeing and knowing the same facts would be justified in believing that he was in similar danger, the person is justified in using deadly force in self-defense. The person is justified even though the appearance of danger later proved to be false and there was actually neither purpose on the part of the other person to kill the person or do the person serious bodily harm nor imminent danger that it would be done, nor actual necessity that deadly force be used in self-defense. If the person so confronted acts in self-defense upon such appearance of danger

from honest belief, the right of self-defense is the same whether the danger is real or merely apparent. However, the right of self-defense is not absolute and is subject to certain conditions and limitations which are set forth in the ensuing instructions.

### INSTRUCTION NO. 25

A person may defend his or her home or habitation against anyone who manifestly intends or endeavors in a violent or riotous manner, to enter that home or habitation and who appears to intend violence to any person in that home or habitation. The amount of force which the person may use in resisting such trespass is limited by what would appear to a reasonable person, in the same or similar circumstances, necessary to resist the violent or unlawful entry. A person is not bound to retreat even though a retreat might safely be made. A person may resist force with force, increasing it in proportion to the intruder's persistence and violence if the circumstances apparent to him are such as would excite similar fears and a similar belief in a reasonable person.

### INSTRUCTION NO. 26

Generally, the right to use self-defense is not available to an aggressor who provokes the conflict. However, if one provokes a conflict but thereafter withdraws in good faith and informs the adversary by words or actions of the desire to end the conflict and is thereafter pursued, that person then has the same right of self-defense as any other person. The person is justified in using force to the same extent that any other person would be who was acting in self-defense.

In order to be considered an aggressor, at least in the context of attempted homicide, "some sort of physical aggression or a threat of imminent use of deadly force is required before a person will be considered an aggressor."

### INSTRUCTION NO. 27

Even if the defendant had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, the defendant was justified in using deadly force to repel the danger only if he retreated as far as he safely could do before using deadly force. The law requires a person to retreat rather than to take the life of an adversary if there was a convenient mode of retreat without increasing his actual or apparent peril. To excuse a failure to retreat, it is necessary that the defendant's peril would be increased, or that it reasonably appeared that it would be increased, by retreat. If you find that the defendant could have safely retreated but failed to do so, the defendant cannot rely on the justification of self-defense.

### INSTRUCTION NO. 28

If you find the defendant was entitled to use self-defense, then before the defendant may be convicted of any crime, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense.

 [¶69] We explained in *Drennen* that, to justify taking the life of another under the theory of self-defense, the defendant first must present a prima facie case of each element of the affirmative defense. 2013 WY 118, ¶ 39, 311 P.3d at 129. If the defendant carries this slight burden, the burden shifts to the State to prove that the defendant did not justifiably act in self-defense. *Id.* As to the duty of retreat, we held that the use of deadly force is justifiable only if necessary and, therefore, before using such force, a defendant must consider reasonable alternatives, which *may* include retreat. *Id.* An "aggressor," however, *must* withdraw or retreat before asserting his right of self-defense. *Id.* Thus, when a defendant makes a prima facie case that he acted in self-defense, the trial court must first instruct the jury on the legal definition of "aggressor."[16] *Id.* Next, the trial court must instruct the jury that if it determines the defendant to be the aggressor, then the defendant was required to retreat before exercising his right of self-defense. *Id.*

---

**16.** In the context of homicide "some sort of physical aggression or a threat of imminent use of deadly force is required before a person will be considered an aggressor." *Drennen,* ¶ 34, 311 P.3d at 128.

[¶70] The district court found that Mr. Schmuck presented a prima facie case of self-defense. Consequently, the district court was obliged to instruct the jury that, because a defendant may use deadly force only when necessary, the defendant generally had a duty to consider reasonable alternatives, which may include retreat; but, if the jury determined the defendant to be the aggressor, the defendant had an absolute duty to retreat or withdraw before regaining the right of self-defense. Instruction No. 27, however, created an absolute duty to retreat regardless of whether the jury determined Mr. Schmuck to be the aggressor. Therefore, it violated the clear and unequivocal rule of law set out in *Drennen*.[17]

[¶71] A correct instruction would have required the jury to determine that Mr. Schmuck was the aggressor before charging him with the absolute duty to withdraw or retreat. The record shows, however, that Mr. Schmuck was the clear aggressor: he entered the property in clear violation of a restraining order, cut the telephone line, forcefully broke down the locked front door of the home, yelled out at Mrs. Schmuck, and directly advanced to her bedroom with the hatchet in his hand. Because Mr. Schmuck was the aggressor, he had the absolute duty to retreat before resorting to deadly force in self-defense. Therefore, there is no reasonable possibility that a correct instruction would have changed the outcome of the trial. *Tingey*, 2017 WY 5, ¶ 27, 387 P.3d at 1178. Because Mr. Schmuck suffered no prejudice from the improper instruction, we have no grounds to reverse.

## II. Did the cumulative error of two or more improper jury instructions deprive Mr. Schmuck of his right to a fair trial?

[¶72] Mr. Schmuck alleges that the accumulated effect of the instructional errors denied him a fair trial. Cumulative error occurs when "two or more individually harmless errors ha[ve] the potential to prejudice the defendant to the same extent as a

single reversible error." *Hamilton v. State*, 2017 WY 72, ¶ 19, 396 P.3d 1009, 1015 (Wyo. 2017) (citations omitted). In conducting a cumulative error evaluation, we consider only matters that we have determined to be errors. *Id.* The cumulative effect of the errors must have so prejudiced the defendant that his trial was not fair and impartial. *Id.* at ¶ 7, 396 P.3d at 1012.

[¶73] We have determined two clear errors at Mr. Schmuck's trial. First, the district court's definition of "malice" for the purposes of first-degree murder plainly contradicted the definition of "malice" required by *Johnson*, 2015 WY 118, ¶ 14, 356 P.3d at 771. Mr. Schmuck's acquittal of first-degree murder confirms that he suffered no prejudice from this error. Second, the district court explicitly violated our holding in *Drennen* by instructing the jury that Mr. Schmuck had an absolute duty to retreat. 2013 WY 118, ¶ 39, 311 P.3d at 129. Mr. Schmuck suffered no prejudice from this error because the record clearly showed he was the aggressor with a duty to retreat and, therefore, a proper instruction would have compelled the same verdict.

[¶74] We did not need to determine whether the district court's failure to inform the jury of the State's burden to prove the absence of a sudden heat of passion to convict Mr. Schmuck of attempted first-degree or second-degree murder violated a clear rule of law. However, even if it transgressed a clear and unequivocal rule of law, Mr. Schmuck argued that he did not act with a sudden heat of passion. Thus, he suffered no material prejudice from the district court's failure to instruct the jury in accordance with *Shull*, as it would not change the jury's verdict. In aggregate, the prejudicial effect is negligible and we find no cumulative error.

### CONCLUSIÓN

[¶75] We find no plain error or cumulative error in the district court's instructions regarding sudden heat of passion, the definition of "malice" in the context of first-degree murder, the definition of "malice" in the con-

---

17. Instruction No. 27 is the same pattern instruction (W.Cr.P.J.I. 8.08) that we rejected in *Drennen*, ¶¶ 11-14, 311 P.3d at 121-22 and *Haire v.*

*State*, 2017 WY 48, ¶ 35, 393 P.3d 1304, 1313 (Wyo. 2017).

text of second-degree murder, an aggressor's right to use self-defense, or the duty to retreat before asserting the right of self-defense. We also find that the district court did not abuse its discretion by instructing the jury on the definitions of both "malice" and "maliciously." Affirmed.